721 So.2d 363 (1998)
Mark L. GIBSON, Appellant,
v.
STATE of Florida, Appellee.
No. 97-03477.
District Court of Appeal of Florida, Second District.
October 28, 1998.
*364 Donald A. Smith, Jr., of Smith & Tozian, P.A., Tampa, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Jean-Jacques Darius and Michael J. Scionti, Assistant Attorneys General, Tampa, for Appellee.
ALTENBERND, Acting Chief Judge.
Mark L. Gibson appeals his judgments and sentences for capital sexual battery and lewd and lascivious acts upon an 8-year-old victim. We affirm. Neither the conduct of law enforcement during pretrial interviews nor the events immediately preceding this trial resulted in preserved, reversible error. Although a sentence of life with no possibility of paroleeffectively imprisonment until deathmust seem harsh from the perspective of this 23-year-old prisoner with no prior criminal record, he was convicted of a serious offense for which this penalty is neither cruel nor unusual.

I. THE EVIDENCE
Mr. Gibson was the stepfather of the 8-year-old female victim. On Friday, January 17, 1997, the mother and the victim were watching a television show involving a young child who had been sexually molested. The mother asked her daughter if anything similar had ever occurred to her. Initially, the child put her head down and would not answer. Following a few more questions, she said that her "daddy" had touched her. The child did not provide any detailed description of the events.
The mother placed the child in her car and drove to her husband's place of employment. She confronted him about the allegations. She testified that he admitted that he had "messed" with the child. She did not ask her husband for details of these events, but learned that the last occurrence had been in early January. The mother asked Mr. Gibson to leave the home, but did not immediately report the matter to the police. The mother revealed this incident to her own mother, who reported the matter to the sheriff's department. A deputy sheriff came to the home on Sunday, January 19, 1997, and filed a report. A few days later, a detective interviewed the child and Mr. Gibson. At trial, the deputy did not testify concerning the statements of the victim. He primarily testified regarding his recorded interview of Mr. Gibson, which took place in a police interrogation room. An edited transcript of that interview was read to the jury.
At the beginning of the interview, the officer read Mr. Gibson his Miranda[1] rights. After reading these rights, the officer stated: "A lot of legal garbage but it basically comes down to the point that you don't have to talk to me if you don't want to." Mr. Gibson then asked the officer whether the victim was present behind a two-way mirror. Once he knew the victim was not present, he agreed to talk to the officer. After initially denying any wrongdoing, Mr. Gibson's statement gradually evolved toward admitting misconduct. Near the end of the interview, the detective asked:
Okay. So, your penis has actually touched her vaginal area? I'm not saying up inside, but it's touched the lips of her vaginal area?
Mr. Gibson answered the question: "Yes, sir."
The victim was the first witness to testify at trial. During direct examination, she testified that Mr. Gibson put his hand or fingers into her "private part." She also claimed that he put his private part "halfway" into her private part and that it hurt. Each of these acts occurred on several occasions. In addition, she said he also touched her bottom with his mouth and his private part. She touched his private part with her hands because he told her to do this.
*365 On cross-examination, the victim confirmed that she knew the meanings of the words "vagina" and "penis," and that Mr. Gibson had placed his penis into the opening of her vagina. Her vagina did not bleed. She explained that, on several occasions, "white stuff" had come out of his penis during these events. The fluid came out when his penis was "soft." She further testified that Mr. Gibson licked her vagina.
A nurse, who had examined the victim in late January, testified that her examination of the victim was essentially normal. The child's hymen was intact. Although this physical examination would not be consistent with extensive penetration of the child's vagina by an adult penis, it did not rule out the possibility that Mr. Gibson's penis touched the opening of her vagina. The nurse, who was an experienced member of a child protective team, testified that girls with little sexual experience sometimes confuse insertion of a penis into the labia with vaginal penetration.

II. AMENDING THE INFORMATION AND CHANGING LAWYERS PRIOR TO TRIAL
The original information in this case charged Mr. Gibson with three counts of capital sexual battery based on penile penetration or union, digital penetration, and oral union. The information included a fourth count of lewd and lascivious conduct based on Mr. Gibson's request to have the child touch his penis. On the Friday before trial in June 1997, the State amended the information to allege two counts of capital sexual battery, dropping the charge of oral union. The amended information included three counts of lewd and lascivious conduct, adding charges based on improper contact with the victim's buttocks and fondling the victim's vagina. It is clear that the State was not adding any new incidents to the information, but was merely attempting to reconfigure the charges arising out of the events as reported in January.
On Monday, immediately preceding trial, Mr. Gibson moved for a continuance. Although he was concerned with the amendment to the information, he was primarily concerned that the public defender had unilaterally assigned his attorney to another division. Mr. Gibson had been assigned a new assistant public defender to defend his capital felony charges only one working day before the trial. The trial court denied the continuance, maintaining that the policy decision of the public defender's office was not the court's concern. After jury selection, Mr. Gibson was represented by both his original lawyer and the new lawyer.

III. THE VERDICT
At the conclusion of the case, the jury convicted Mr. Gibson of capital sexual battery on the charge of penile penetration or union, and of lewd and lascivious conduct for the touching of his penis and for his touching of the victim's buttocks. The jury acquitted him of the remaining charges. As the jury was leaving the courtroom, the judge began adjudicating Mr. Gibson and then commented: "Am I correct, as to the first count of the information, the penalty is life imprisonment without possibility of parole?" The assistant state attorney confirmed that this was the mandatory sentence.
Mr. Gibson refused to be fingerprinted. As the court was resolving that problem, the jury returned to the courtroom. One of the jurors, not the foreperson, made a passionate speech, explaining that the jury concluded that something bad had happened in the child's home, but that the misconduct was not entirely Mr. Gibson's fault. Near the end of his speech, the juror said:
We feel the defendant deserves to be punished. I heard you say something about a life sentence. He doesn't deserve a life sentence. I hope it is not a mandatory life sentence. If I would have known that, I don't think I would have voted guilty for it.
If I were King, I would take this child and put it with a different family altogether and hope that she had a great life. This is not to disparage your son or Mrs. Gibson. It's just a very sad situation, and we're all very concerned for the welfare of the child.
Then, the juror turned to the other jurors and said: "Does anybody else have anything they may want to add, or did I sum it up *366 pretty well?" The court reporter then placed in the transcript the comment, "Jurors indicating affirmatively."
The trial court imposed the mandatory life sentence at a later hearing, after Mr. Gibson had rejected an unusual post-verdict proposal from the State that he plead guilty to some offense and waive his appellate rights in exchange for a sentence of imprisonment with the possibility of release after 25 years.

IV. THE ISSUES RELATING TO THE CONVICTION
For the first time on appeal, Mr. Gibson argues that his statements to the detective should have been suppressed because he did not make a knowing and voluntary waiver of his Miranda rights. See Moran v. Burbine, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); Brookins v. State, 704 So.2d 576, 577 (Fla. 1st DCA 1997); State v. Mallory, 670 So.2d 103, 106-107 (Fla. 1st DCA 1996). He emphasizes both the detective's characterization of the United States Supreme Court decision as "legal garbage," and the officer's failure to point out that the crime as described by the victim would result in a mandatory sentence of life imprisonment without possibility of parole.
The State responds that this issue is not preserved. We agree that Mr. Gibson's attorneys never filed a motion to suppress his statement and affirmatively indicated no objection to its introduction into evidence. Thus, this issue cannot be reviewed on direct appeal. See § 924.051, Fla. Stat. (Supp. 1996).
Mr. Gibson also argues that the trial court erred in refusing to grant his motion for continuance, based on the amendment to the information and on the change in his legal representation. Concerning the late amendment to the information, it is not clear from the record that his attorneys perfected an objection to this amendment. The amendment was briefly addressed during a much longer discussion about the problem created by the shuffling of attorneys in the public defenders' office. In light of the failure of the lawyers to suggest how this amendment changed their defense strategy in any fashion, and given that the amendment did not add a new factual basis for these charges and actually downgraded one of the charges, we conclude that the trial court did not commit reversible error by denying the continuance. See State v. Conte, 516 So.2d 1115 (Fla. 2d DCA 1987) (defendant did not show prejudice from State's delay in adding conspiracy count to information charging trafficking in cocaine); cf. Turner v. State, 376 So.2d 429 (Fla. 1st DCA 1979) (amendment of information, which changed charge from misdemeanor to felony offense, was change of substance and prejudiced defendant's right to fair trial); Lawson v. State, 251 So.2d 683 (Fla. 3d DCA 1971) (reversing conviction because information substantially amended after trial proceedings commenced).
Mr. Gibson tries to equate the repositioning of attorneys in the public defender's office to a circumstance in which there is a substitution of counsel immediately preceding trial. See Holley v. State, 484 So.2d 634 (Fla. 1st DCA 1986). Such a change in assistant public defenders is not the same as a substitution of counsel. The public defender's office is comparable, in some respects, to a law firm. The trial court had appointed that office, not a specific assistant public defender, to represent Mr. Gibson. His lawyers' decision to reassign his case to another attorney, especially when that decision was made on the Friday before his trial for a capital felony, may raise an issue of ineffective assistance of counsel, but it did not compel the trial judge, who was uninvolved in the reassignment, to grant a continuance. See Cox v. State, 354 So.2d 957 (Fla. 3d DCA 1978) (change of assistant public defenders one day prior to trial did not compel continuance); see also United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (last-minute substitution of trial counsel does not automatically render assistance ineffective). Our record does not provide a basis to reverse on this issue.

V. LIFE IMPRISONMENT IS NOT CRUEL OR UNUSUAL IN THIS CASE
The narrow constitutional issue presented by this case is whether the legislature *367 has the power to impose a mandatory sentence of life without possibility of parole for the crime of penile union with the vagina of a girl less than 12 years of age when a defendant has no prior criminal record. This opinion does not address the constitutionality of this mandatory sentence for other conduct that is defined as capital sexual battery. Although the issue is close and this extreme penalty may cause some intrafamilial crimes to go unreported, we conclude that the penalty is not cruel or unusual.

A. The Evolution of the Current Capital Sexual Battery Statute.

The evolution of the current crime of capital sexual battery and its mandatory penalty warrants brief examination. Through the 1960s, capital sexual battery was punishable by death. During that period, capital sexual battery required proof that a defendant "carnally know and abuse a female child." See § 794.01, Fla. Stat. (1969). That statute, based on the common law, required proof of penetration. See Askew v. State, 118 So.2d 219, 221 (Fla.1960). Under that statute, Mr. Gibson could have been convicted of a lesser offense, but probably would not have been convicted of capital sexual battery.
Florida's rape statute was amended in 1974. See ch. 74-121, Laws of Fla. The amendment changed the definition of sexual battery to "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object." § 794.011(f), Fla. Stat. (Supp.1974). This is the same definition of sexual battery that is used in the current statute. See § 794.011(1)(h), Fla. Stat. (1997). This anatomically correct, but more antiseptic, definition of capital sexual battery transformed acts that were previously lesser offenses into capital sexual battery. This amendment also results in the more frequent prosecution of capital sexual battery cases in which there is little, if any, physical evidence of rape. Often a defendant is convicted of this crime based primarily, if not exclusively, on the testimony of a young child.
In 1972, the United States Supreme Court held that the death penalty constituted cruel and unusual punishment and struck down existing state death penalty statutes. See Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The death penalty was reinstated by the Florida Legislature in a different form in 1973. See § 921.141, Fla. Stat. (1973). Compare § 921.141, Fla. Stat. (1971). In Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court addressed the issue of the constitutionality of the death penalty for the rape of an adult woman. The Court held that the death penalty was grossly disproportionate to the severity of the crime and thus unconstitutional. The Court did not, however, address the constitutionality of the death penalty for those convicted of rape of a child.
In Buford v. State, 403 So.2d 943 (Fla. 1981), the Florida Supreme Court held that the sentence of death is grossly disproportionate and excessive punishment for sexual battery of a child.[2] Thus, we know that the only penalty in the Florida Criminal Code that is more extreme than that imposed upon Mr. Gibson would be unconstitutional if applied in this case.
After the 1974 statutory amendment and the Buford decision, the maximum penalty for capital sexual battery was life imprisonment with the possibility of parole after 25 years. See § 775.082(1), Fla. Stat. (1981). It is well established that life imprisonment with possibility of parole is a constitutional penalty for capital sexual battery, as defined in section 794.011(1)(h). The Florida Supreme Court so held in 1976. See Banks v. State, 342 So.2d 469 (Fla.1976); see also Harrison v. State, 360 So.2d 421 (Fla.1978); Kendry v. State, 517 So.2d 78 (Fla. 1st DCA 1987).
Mr. Gibson argues that Banks and its progeny are no longer controlling because the legislature eliminated the possibility of *368 parole for capital sexual battery convictions in 1995. See ch. 95-295, Laws of Fla.[3] Effective October 1, 1995, the legislature amended section 775.082(1), Florida Statutes (1995), so that all capital felonies not resulting in the death penalty are subject to a mandatory sentence of life without possibility of parole. Thus, all capital felonies are now punishable either by death by execution or by imprisonment until death.[4] The jury in this case demonstrates that not all members of the public are aware of this change in the law.

B. Cruel or Unusual Analysis.

We have the power to declare this mandatory life sentence "cruel or unusual" under Article I, Section 17 of the Florida Constitution or "cruel and unusual" under the Eighth and Fourteenth Amendments of the United States Constitution. See Hale v. State, 630 So.2d 521 (Fla.1993); Williams v. State, 630 So.2d 534 (Fla.1993). We are required to base this decision upon a proportionality review. See Hale, 630 So.2d at 525. The methodology for such a review is not yet explained in any detail in the controlling case law. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); Hale, 630 So.2d at 525. In Harmelin, Justice Kennedy explained:
Though our decisions recognize a proportionality principle, its precise contours are unclear. This is so in part because we have applied the rule in few cases and even then to sentences of different types. Our most recent pronouncement on the subject in Solem, furthermore, appeared to apply a different analysis than in Rummel [v. Estelle, 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 3827 and [Hutto v.] Davis, 454 U.S. 370, 373-374, 102 S.Ct. 703, 705-706, 70 L.Ed.2d 556]. Solem twice stated, however, that its decision was consistent with Rummel and thus did not overrule it. Solem, supra, 463 U.S., at 288, n. 13, 303, n. 32, 103 S.Ct., at 3008, n. 13, 3017, n.32.
501 U.S. at 998, 111 S.Ct. 2680.
Even though the precise contours of the proportionality analysis are unclear, the United States Supreme Court has specifically stated that a proportionality analysis should be guided by objective criteria, including: (i) the gravity of the offense and the harshness of the penalty, (ii) the sentences imposed on other criminals in the same jurisdiction, and (iii) the sentences imposed for commission of the same crime in other jurisdictions. See Solem, 463 U.S. at 292, 103 S.Ct. 3001. Justice Kennedy suggests that precedent establishes several common Eighth Amendment principles that effectively require the courts to give broad deference to the substantive penological policies announced by the state legislature without undue comparison to the policy decisions of other states.[5]See Harmelin, 501 U.S. at 998-99, 111 S.Ct. 2680.
Considering first the gravity of the offense of capital sexual battery and the harshness of the penalty of life imprisonment without the possibility of parole, we do not question the legislature's wisdom in deciding that this crime is a very grave offense warranting severe punishment. Child sexual predation is a serious concern. See § 775.21, Fla. Stat. (1997). Even when it leaves no physical scars, it can create emotional damage that lasts a lifetime. There is evidence that victims of abuse become abusers and that this crime can transmit its injuries across generations. *369 See Kristyn M. Walker, Judicial Control of Reproductive Freedom: The Use Of Norplant As A Condition Of Probation, 78 Iowa L.Rev. 779, 794 (March 1993); Charles A. Phipps, Children, Adults, Sex And The Criminal Law: In Search Of Reason, 22 Seton Hall Legis. J. 1, 107 (1997). Because victims hesitate to report this crime and proof of the offense is often difficult to obtain, there is a risk that perpetrators will believe they can escape detection and punishment. As a result, there is a need for a harsh penalty to act as a sufficient deterrent. It is useful to recall that a sentence of life imprisonment with the possibility of parole after 25 years came with no promise of parole. For many prisoners, the sentence imposed for capital sexual battery prior to October 1995 may result in a sentence just as long as a sentence imposed after 1995. Thus, weighing this criteria alone, we cannot conclude that life imprisonment without possibility of parole is a disproportionate penalty for this variety of sexual battery.
Second, we consider the sentences imposed on other criminals in this jurisdiction. There is little question that Florida has a history of imposing lengthy prison sentences for many offenses. Except for the brief period following the decision in Furman, this state has always utilized the death penalty. It is difficult to compare the type of sexual offense that occurred in this case to crimes such as murder or robbery. Murder takes a person's life with no chance that it can be returned; capital sexual battery inflicts lasting emotional scarring and takes a child's innocence with no chance that it can be returned. Robbery steals a person's property and risks personal safety; capital sexual battery steals a person's sense of self with an equal risk to personal safety. The legislative choice to imprison these offenders until death may involve a considerable commitment of state resources, but it is not disproportionate to the punishment we provide to other criminals who violate cherished personal rights, as compared to property rights.
Third, we consider the sentences imposed for commission of the same crime in other jurisdictions. The parties have provided us with little information to use in this analysis. We have chosen to look at the statutes in our neighboring states of Mississippi, Alabama, and Georgia. Although Florida appears to impose the most severe punishment for a sexual battery without penetration, all states provide extensive penalties. In Mississippi, sexual battery is defined similarly to capital sexual battery in Florida. See Miss.Code Ann. § 97-3-95(1)(d) (1997). A person who is convicted of sexual battery in Mississippi and is 18 years of age or older shall be imprisoned for life or such lesser term of imprisonment as the court may determine, but not less than 20 years. See Miss.Code § 97-3-101(3) (1997). Alabama's legislature defines rape in the first degree similarly to the Florida Legislature's definition of sexual battery. See Ala.Code 13A-6-61(a)(3) (1997). Those convicted of rape in the first degree in Alabama can be punished by imprisonment for life or not more than 99 years or less than 10 years. See Ala.Code 13A-5-6(a)(1) (1997). Finally, Georgia's statute is hard to equate to Florida's statute because Georgia still relies on the common law concept of "carnal knowledge" to define rape. However, a person convicted of the offense of rape in Georgia may be punished by death, by imprisonment for life, or by imprisonment for not less than 10 or more than 20 years.[6]See Ga.Code Ann. § 16-6-1(b).
We have no data that would allow us to know whether any state except Florida consistently or mandatorily imposes a sentence of life imprisonment without possibility of parole for sexual battery without penetration. Nevertheless, our brief examination of neighboring states does not suggest that Florida's penalty is so out of line as to render our legislature's selected punishment unconstitutional.
Applying these objective criteria, we conclude that life imprisonment is a proportionate punishment for the offense of sexual battery and does not constitute cruel or unusual *370 punishment. There is reason to be concerned that family members who know about the severity of this penalty will hesitate or even refuse to report intrafamily sexual battery, or choose not to cooperate with its prosecution. The eloquent juror in this case demonstrates that jurors who understand the law may choose to exercise their options of jury pardon in some cases. Thus, there is a possibility this inflexible mandatory penalty of life imprisonment may result in fewer convictions for this type of sexual predation than a more flexible penalty. As a result, this more severe punishment may ultimately prove to be a lesser deterrent than a more flexible penalty. These concerns, however, are matters for consideration by the legislature and do not affect this court's constitutional analysis.
Affirmed.
NORTHCUTT and GREEN, JJ., concur.
NOTES
[1] See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Despite the holding in Buford v. State, 403 So.2d 943 (Fla. 1981), the Florida Legislature never changed the wording of the sexual battery statute. Thus, upon reading the statute today it would appear that the death penalty could be imposed for those convicted of capital sexual battery. See § 794.011(2)(a), Fla. Stat. (1997).
[3] Parole was also eliminated for certain homicides in 1995. See ch. 94-228, Laws of Fla.
[4] These new life sentences without possibility of parole are sometimes referred to as "death by imprisonment." Although there is rhetorical balance between "death by execution" and "death by imprisonment," this description overlooks an important distinction between the two penalties for purposes of an analysis of their constitutionality under the Cruel and Unusual Punishments Clause. Execution is death imposed and carried out by the state; death is the punishment in such cases. A sentence of life imprisonment merely ends when death naturally occurs. Thus, death is not a portion of the punishment when the sentence is life without possibility of parole.
[5] In Harmelin, 501 U.S. 957, 966-75, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), Justice Scalia, writing for himself and Justice Rehnquist, argues that from a historical analysis, the proper question for a cruel and unusual analysis should be whether the sentence is illegal, not whether is it proportionate. From this perspective, there is no question that the sentence in this case is not cruel and unusual.
[6] At least for adult female victims, this statute is unconstitutional. See Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).