754 So.2d 731 (2000)
Raymond PALAZZOLO, Appellant,
v.
STATE of Florida, Appellee.
No. 2D98-416.
District Court of Appeal of Florida, Second District.
January 12, 2000.
Rehearing Denied April 6, 2000.
*733 Bruce G. Howie of Piper, Ludin, Howie & Werner, P.A., St. Petersburg, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Patricia E. Davenport, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Acting Chief Judge.
Raymond Palazzolo appeals his convictions and sentences for one count of capital sexual battery and one count of lewd and lascivious conduct. He raises numerous issues on appeal arising from a trial that was both procedurally and factually complex. We reverse his convictions due to several errors and remand for a new trial.

I. THE PROCEEDING BELOW
The State's information alleged that on an evening in the fall of 1996, when C.G. was six years old, Mr. Palazzolo penetrated her vagina with his finger, had union between his mouth and her sex organ, and exposed his penis in her presence. For this conduct, the State charged two counts of capital sexual battery and one count of lewd and lascivious conduct. The information was amended three times. Initially, the information alleged that this conduct occurred on Saturday, November 9, 1996. Six months later, the State amended the information to allege an unspecified date between November 7 and December 15. Finally, a few months before trial, the State alleged a date between November 7 and November 29, 1996. Mr. Palazzolo was the former boyfriend of C.G.'s mother. The State claimed that she had allowed him to babysit her young son and daughter one night in November while she went to the store. The State maintained that the mother left her children with Mr. Palazzolo, even though she had recently obtained a domestic violence injunction to keep him away from her. The criminal episode allegedly took place while the mother was on that shopping trip. Thus, the only direct witnesses were the two children, who were under the age of eight. The State had no physical evidence to support the charges. The dates in the information were apparently changed because the boy's testimony suggested this event took place on a Sunday. Later investigation established that the children were with their father on Saturday and Sunday. The mother claimed the event took place on the preceding Friday.
Mr. Palazzolo claimed that the mother hated him because of an incident of domestic violence that occurred in front of the children in May. He maintained that he had never been to the mother's apartment after she moved out of his house. It was his theory that the children's father, S.G., may have assaulted C.G. on Sunday, and the children had psychologically transferred this event to him. The trial court prevented him from introducing evidence that S.G. was a convicted sex offender and also excluded proffered testimony from a psychologist about his transference theory. Neither party called S.G. as a witness, and the State provided no independent witness *734 to establish that Mr. Palazzolo had ever been to the mother's apartment.
During the trial, the court granted Mr. Palazzolo's motion for judgment of acquittal on the count of capital sexual battery alleging oral union, but denied the remaining motions for judgment of acquittal. The trial court denied Mr. Palazzolo's requests for a twelve-person jury. It also refused to give an instruction describing the penalty for capital sexual battery. It declined to allow him to voir dire the victim to establish whether she was competent to testify prior to her testimony. It allowed the State to introduce extensive child victim hearsay as cross-examination in the defense's case without complying with the requirements of section 90.803(23), Florida Statutes (1997). The trial court gave jury instructions that were not the standard instructions and allowed digital "union" to constitute capital sexual battery.
At the conclusion of the trial, the jury found Mr. Palazzolo guilty of the two remaining charges, and he was sentenced to life imprisonment without possibility of parole on the capital sexual battery charge and to a concurrent term of 26 months in prison for the lewd and lascivious charge.

II. THE EVIDENCE
C.G. is a little girl who was born in the fall of 1990. Mr. Palazzolo was a friend of C.G.'s mother. The mother, C.G., and C.G.'s eight-year-old brother lived with Mr. Palazzolo until May 1996. In May, the mother and Mr. Palazzolo had a domestic dispute. As a result, she obtained a domestic violence injunction against him. Nevertheless, she claims that he came to her apartment with her approval on at least six occasions over the next few months, and that she left her two children with him on an evening in November 1996.
C.G., who was seven when she testified at trial, initially claimed that she did not remember the night that Mr. Palazzolo came to babysit. After a little coaxing, she remembered the night and that her mother had gone shopping. She said that Mr. Palazzolo played games with her for awhile, but then pulled down his pants and exposed his "pee-pee" to her in her mother's bedroom. When she refused to touch his penis, he grabbed her hand and forced her to touch it. This frightened C.G., so she ran into the living room to be with her brother. He appeared to be sleeping.
In the living room, while C.G. was lying on a couch, Mr. Palazzolo lifted up her nightgown and stuck his two fingers "up [her] crotch." This "stung." She "kept on scooting up" until she banged her head on "the pole" because his fingers hurt her. The record does not establish what she meant by the pole. Then she fell asleep and her mother came home. She denied that Mr. Palazzolo did anything with his tongue.
C.G.'s brother had not seen Mr. Palazzolo for more than a year before the trial and did not identify him at trial. He admitted that he disliked Mr. Palazzolo, apparently because of the earlier domestic violence incident. He testified that Mr. Palazzolo babysat the two children on an evening and that they initially played a Mighty Morphin Power Ranger game. Then Mr. Palazzolo took his sister into his mother's bedroom. At first, the boy pretended to be asleep on the couch. Then, he tip-toed to the doorway of the bedroom. He saw Mr. Palazzolo expose his privates to his sister. He also heard Mr. Palazzolo ask her to touch his penis and saw her touch it. Then the boy accidentally made a noise and was afraid that he would be discovered, so he returned to the couch and pretended to sleep. When Mr. Palazzolo and his sister returned to the living room, he heard Mr. Palazzolo warn her not to tell anyone or she would get in trouble. He did not testify about any incident of digital penetration in the living room. It is obvious from the record that the two children had discussed their testimony with one another prior to the trial.
*735 The boy testified that he told his mother about the incident the day after it occurred. C.G.'s mother testified that her son told her about this incident on the Monday after this incident. This is significant because, if the boy's testimony is accurate, the incident took place on Sunday. The two children spent Saturday and Sunday with their father, who is divorced from the children's mother. The father is a convicted sex offender. As explained later, the jury was never allowed to know about the father's criminal record.
After her son told her about the incident, the mother took her daughter aside to ask her about the event. The girl was reluctant to talk and told her that Mr. Palazzolo had shown her his pee-pee. The daughter did not disclose any incident of digital penetration at that time, but the mother implied that her daughter told her later about such an event. At some point, the daughter told her mother that she might have dreamed the incident. The mother claims that she confronted Mr. Palazzolo and that he denied everything. She claims he threatened to harm her if she reported the incident to the police. This incident was reported to the police by an undisclosed source about ten days later.
As part of the State's investigation, C.G. was examined by a physician on December 18, 1996. He found no physical evidence of digital penetration. He admitted that it would be very unusual for a young girl to have no physical damage if her vagina had been penetrated by two fingers because the opening at the hymen would only be five to six millimeters wide. Then he stated:
Well, again, it depends on what you call penetration. If penetration includes the concept of touching or union with the external genitalia, then this is, of course, quite possible to happen with any number of fingers.
Although an investigation occurred, the State did not call any child abuse investigator as a witness. It did call a police officer who had attempted to arrange an interview with Mr. Palazzolo. The officer testified that Mr. Palazzolo agreed to be interviewed, but he did not appear for the interview. Instead, Mr. Palazzolo left the state.
Mr. Palazzolo testified at the trial. He claimed that the mother and her two children lived with him during the first six months of 1996, and that he babysat the children on occasions prior to that time. He admitted that the couple had a fight in May, and that he hit the mother hard enough to require stitches in her head. The children had witnessed this fight. The mother was granted an injunction for protection against domestic violence on the basis of this incident and, as a part of this injunction, Mr. Palazzolo was to have no contact with the mother.
He went to New York after the fight in May, but called the mother in July to tell her she had to leave his house because he was coming home and could not live with her. He claimed she was irate about being forced to move out. In October, he pleaded guilty to some offense stemming from the incident of domestic violence and was placed on one year's probation. The record is not entirely clear, but it appears that a condition of his probation was to have no contact with the mother.
Mr. Palazzolo testified that he obeyed the conditions of the domestic violence injunction and his probation and never went to the apartment where the mother and two children lived at the time of the alleged sexual battery. He claimed that he did not even know the location of the apartment. He testified that he spent every Friday evening in November with a female friend. Generally they spent Friday evenings watching television, but occasionally they would go out to shoot pool. Mr. Palazzolo, however, could not remember the events of any specific Friday evening in November. The friend confirmed his alibi. Mr. Palazzolo testified that C.G.'s mother called him in mid-December to tell him that she was going to make him *736 suffer like she had suffered and that she knew how to work the system and was going to have the children claim he abused them. He proffered testimony that she compared what would happen to him to what had happened to the children's father when the father had been charged with sexual abuse. He also called his own mother as a witness to testify about the animosity between C.G.'s mother and Mr. Palazzolo. He claimed he fled the state because he was afraid of these threats and did not have money to hire a lawyer.
Mr. Palazzolo called two child abuse investigators in his case. The first investigator interviewed the boy at the time of the December investigation after she received a report that the girl had been abused either by her father or her mother's boyfriend. The boy did not tell the investigator that he witnessed any incident except that he saw Mr. Palazzolo take his sister into the bedroom. The defense used this witness to explain what the boy did not say; it did not ask this witness any questions about an interview with the little girl. On cross-examination over objection, the State was allowed to elicit testimony from this witness concerning the hearsay statements of the little girl. This hearsay was introduced without any of the procedural safeguards required by section 90.803(23), Florida Statutes (1997). The only unequivocal testimony establishing that C.G. claimed Mr. Palazzolo "penetrated" her occurs during this cross-examination.
The second investigator was called by the defense to establish that he interviewed both children, but did not record the interviews. The defense did not ask this investigator about the content of the children's statements, but limited the examination to demonstrate that the method of investigation prevented Mr. Palazzolo and the jury from knowing exactly what occurred at the interview. Again, on cross-examination, the State was allowed, over objection, to have the witness testify in detail about the hearsay statements of both children. The court made no effort to comply with section 90.803(23).

III. THE ISSUES
Mr. Palazzolo raises numerous issues that warrant discussion in this opinion.[1]

1. Whether the defendant in a capital sexual battery trial is entitled to a jury of twelve and to an instruction concerning the penalty.
Mr. Palazzolo recognizes that existing law authorizes a six-person jury in a capital sexual battery case. See State v. Hogan, 451 So.2d 844 (Fla.1984). He also recognizes that Florida Rule of Criminal Procedure 3.390(a) overrides section 918.10(1), Florida Statutes (1997), and precludes an instruction explaining a penalty when the jury will play no role in sentencing. See Knight v. State, 668 So.2d 596 (Fla.1996). Nevertheless, he argues that capital sexual battery is now more akin to a true capital offense because the legislature has eliminated all possibility of parole.[2]See §§ 794.011(2)(a), 775.082(1), Fla. Stat. (1997); Gibson v. State, 721 So.2d 363 (Fla. 2d DCA 1998).
*737 This case demonstrates that the evidence in a capital sexual battery trial can often be much more tenuous than the evidence in a capital homicide trial. In almost all first-degree murder trials, there is little question that a murder occurred. In capital sexual battery cases, the proof that any crime occurred often depends exclusively upon the testimony of a child of tender years. There may be merit to a rule of procedure requiring a jury of twelve in these cases or to a procedural rule allowing the jury to receive an instruction on the penalty comparable to the instruction that the legislature attempted to mandate in section 918.10(1), Florida Statutes (1999). These are issues, however, for resolution in the supreme court in its prospective rule-making capacity. We affirm the trial court's decision to apply the existing rules of procedure in this case.

2. Whether the trial court committed fundamental error by instructing the jury that digital capital sexual battery could be established by proof of "union."
The facts of this case are similar to those in Gill v. State, 586 So.2d 471 (Fla. 4th DCA 1991). Gill involved allegations that the defendant digitally penetrated a young boy's anus. After a jury trial, the court gave the correct standard instruction for a digital penetration case. See Fla. Std. Jury Instr. (Crim.) 167.[3] However, the court also instructed the jury that "union is an alternative to penetration and means coming into contact." During closing argument, the prosecutor indicated that the jury could find the defendant guilty if his finger penetrated or had union with the victim's anus. The court held that the trial court's instruction to the jury was fundamentally erroneous because, when coupled with the prosecutor's comments, it misled the jury as to a required specific element of the crime charged.
In the present case, the doctor's testimony confused the concepts of penetration and union. The prosecutor in this case, like the prosecutor in Gill, stated that Mr. Palazzolo would be guilty of sexual battery if his finger "penetrated or had union with the vagina of [C.G.]." These are incorrect statements of the law. See Richards v. State, 738 So.2d 415 (Fla. 2d DCA 1999). Rather than correct these misstatements, the trial court exacerbated the problem by reading an instruction that deviated from the standard instruction. The trial court instructed the jury that capital sexual battery was proven if the State established that "the finger of the defendant penetrated or had union with the vagina of the victim."
In fairness to the trial judge, it appears that the instruction he read to the jury may have been prepared by the State. It also appears that there was no disclosure to the judge that this instruction was not the same as the standard instruction. Nevertheless, the instruction given, coupled with the doctor's testimony and the prosecutor's comments, served to mislead the jury as to a required specific element of the offense of capital sexual battery. As in Gill, we find there was fundamental error in this case where the instruction itself was erroneous and where there were misleading comments made during the trial. See also Richards, 738 So.2d 415.

3. Whether the trial court erred in refusing to allow voir dire of the child victim on the issue of competency.
When C.G. was called as the State's first witness, the assistant state attorney first asked a typical cluster of questions to establish that the young child was competent to testify. When asked whether she knew the difference between a truth and a lie, she replied, "I forgot that *738 one." When given concrete examples of truths and lies, the seven-year-old witness responded appropriately.
When the State concluded this line of questioning, the defense requested the opportunity to voir dire the witness on the issue of competency. Defense counsel explained that competency was a threshold issue that the court must resolve before the child testified. Surprisingly, the State argued that the questions should be asked on cross-examination, and the trial court accepted that approach. The trial court did not defer ruling on competency, but essentially made a determination of competency without any express findings of fact and without permitting confrontation by the defendant.
Although it is well-established that a trial court has broad discretion in making a determination of a child's competency to testify, see Kertell v. State, 649 So.2d 892 (Fla. 2d DCA 1995), competency is an issue of disqualification. See § 90.603(2), Fla. Stat. (1997). When a party challenges the competency of a witness, the trial court should permit voir dire on the issue and make a case-specific determination of the witness's competency to testify. See Griffin v. State, 526 So.2d 752, 754 (Fla. 1st DCA 1988) (stating that when competency of witness is raised as an issue, it is then duty of trial court to examine witness to determine competency). See also Fuller v. State, 669 So.2d 273 (Fla. 2d DCA 1996); Kertell, 649 So.2d 892. This should occur before the witness is allowed to testify.
In this case, it is a close question whether the record establishes the error to be harmless. The girl's direct testimony and cross-examination are generally coherent in the record, but there are some unusual and non-responsive answers. We conclude that the State has not established this error to be harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

4. Whether the trial court erred in admitting child hearsay statements during cross-examination.
The State filed a notice of intent to introduce child hearsay statements from the two investigators who were called during the defendant's case. For whatever reason, this issue was not resolved prior to trial, and the State did not call these witnesses. The defense called these witnesses to address limited issues and did not request either witness to provide hearsay testimony from either child. Over objection, the trial court allowed both witnesses on cross-examination to provide extensive hearsay testimony from the victim and her brother.
Nothing the defense did in this case waived the requirement for a judicial determination of reliability prior to the admission of these statements. See § 90.803(23)(a)(1), Fla. Stat. (1997). We doubt that these statements were admissible within the scope of cross-examination, but even if they were, the rules of hearsay still apply in cross-examination. The court was required to comply with the requirements of section 90.803(23)(a) before admitting the hearsay. It was harmful error to admit these statements in this case.

5. Whether the trial court erred in excluding "reverse Williams rule" evidence.
Mr. Palazzolo wished to establish that the children's father, S.G., with whom they spent the weekend prior to reporting the incident, was a convicted sex offender. He further wished to present testimony on a psychological theory of transference. In a nutshell, Mr. Palazzolo's defense theory was that if a sexual battery took place against C.G., it was committed by S.G. while the children visited him over the weekend and that the children mistakenly identified Mr. Palazzolo as the assailant due to psychological transference. The trial court prevented the defendant from admitting this evidence. We conclude that the trial court erred by approaching this *739 evidentiary question from the wrong perspective.
In this case, Mr. Palazzolo wanted to present evidence that S.G. pleaded guilty in 1994 to lewd and lascivious conduct involving a girl under the age of sixteen. The record before us contains the deposition of the victim in that case. She was twelve years old and she described S.G. as her uncle.[4] On the evening of April 4, 1993, she was babysitting the two children involved in this case in their home. S.G. and the children's mother were still living together at that time. The victim was sleeping on a couch in the living room near the little boy. She awoke in the early morning hours because S.G. had placed his hand inside her pants and inserted his finger into her vagina. After he removed his finger, he made her place her hand on his erect penis.
It is now well-established that a defendant is entitled to introduce reverse Williams rule evidence in an effort to establish a reasonable doubt of his guilt. See State v. Savino, 567 So.2d 892 (Fla. 1990); Rivera v. State, 561 So.2d 536, 539 (Fla.1990). In such a case, the similar fact evidence is normally introduced to establish that another person was possibly the perpetrator. In Savino, the supreme court reiterated that the test for admissibility of all similar fact evidence is relevancy. The court further explained that the admissibility of reverse Williams rule evidence should be analyzed as if the other possible perpetrator were on trial and the State were seeking to introduce the evidence. See Savino, 567 So.2d at 894. In this case, such an analysis is complex because the defendant claims the crime occurred at a different time and place than that described by the State. Thus, to determine whether S.G.'s conduct was admissible, the trial court was required to compare the facts of S.G.'s crime in 1993 with Mr. Palazzolo's version of what occurred in this case, namely that C.G. was molested by S.G. as she visited with him over the weekend. In other words, to properly rule on the admissibility of Mr. Palazzolo's reverse Williams rule evidence, the trial court needed to determine whether the actual crime committed by S.G. in 1993 was sufficiently similar to a possible crime occurring at S.G.'s house on a Sunday night when his children were visiting him.
Unfortunately, the trial court apparently misunderstood the supreme court's directive in Savino, and decided to exclude the reverse Williams rule evidence on the basis that it was insufficiently similar to Mr. Palazzolo's alleged conduct. The relevant question was not whether S.G.'s conduct was similar to what the State alleged Mr. Palazzolo did in a non-familial context. The relevant question was whether S.G.'s conduct was similar to a possible crime occurring on Sunday evening while the children were at S.G.'s home. Accordingly, on remand, the trial court must conduct an examination of this issue as if the State were prosecuting S.G.
If the State were trying S.G. for a sexual battery on his daughter, which occurred on Sunday night, the State would argue that this crime and the 1993 crime were both committed within a "family relationship." See State v. Rawls, 649 So.2d 1350 (Fla.1994). This would allow the State to invoke the more flexible standard announced in Saffor v. State, 660 So.2d 668 (Fla.1995), for determining admissibility of Williams rule evidence. In light of the victim's deposition testimony, we are inclined to believe that the trial court could properly rule that S.G.'s earlier offense, which was committed on his niece in his own home, did arise in a "family relationship." We decline to hold that the 1993 incident occurred in a family context because on remand the trial court should be free to consider additional evidence from S.G. or other sources to make this decision.
*740 If the trial court decides the 1993 crime arose in a family relationship, the trial court will then need to consider whether there is sufficient similarity between the two events to show that the evidence is relevant. The trial court should consider the factors suggested in Moore v. State, 659 So.2d 414 (Fla. 2d DCA 1995). In this comparison, we note that both victims are young females who were digitally penetrated at night while lying on a couch in the living room. Both events occurred with the same little boy as a potential witness. The perpetrator wanted both girls to touch his penis. Thus, the alleged acts of abuse are very similar, the time and location of the acts are very similar, and the reliability of the Williams rule evidence, in light of the conviction, is quite good.
We do not hold that this reverse Williams rule evidence must be introduced primarily because of the age difference between the two victims. We are inclined to believe that the other similarities are sufficient to overcome this difference, but the trial court may consider additional evidence that would allow it to exclude this evidence. We note, however, the well-established policy requiring the introduction into evidence of all probative evidence tending to prove a defendant's innocence. See Moreno v. State, 418 So.2d 1223, 1225 (Fla. 3d DCA 1982). See also Rivera, 561 So.2d at 539. Thus, although the test to determine the threshold issue of relevancy for Williams rule evidence and reverse Williams rule evidence is essentially the same, we believe that a trial court has somewhat less discretion in deciding whether to exclude a defendant's reverse Williams rule evidence than in deciding whether to introduce the State's Williams rule evidence.[5]
We reverse and remand on this issue to allow the trial court to resolve the issue with a correct analysis. We note that the psychiatrist who was to testify is now deceased and the testimony in this record is not suitable for use in any new trial. On remand, the admissibility of any such expert testimony should be considered anew by the trial court.
Reversed and remanded for a new trial.
DAVIS, J., Concurs. NORTHCUTT, J., Concurs specially.
NORTHCUTT, J., Concurring.
I fully endorse Judge Altenbernd's well-reasoned opinion in this troubling case, but I write separately to voice my unease about the standard of similarity that governs the admission of "reverse Williams Rule" identity evidence.
As Judge Altenbernd observes, reverse similar-fact evidence poses less danger of prejudice to the State than direct similar-fact evidence poses to the defense. The supreme court seemingly acknowledged this in State v. Savino, 567 So.2d 892 (Fla.1990). Nevertheless, in Savino the *741 court rejected the proposition that this lessened risk of prejudice justifies a relaxed standard of similarity of conduct when the defense proposes to introduce such evidence. The court posited that the question of prejudice is not reached until relevance is established, and that similar-fact evidence of other crimes is relevant only if it is of such nature that it would tend to prove a material fact in issue. Thus, in the Savino court's view the similarity inquiry is an aspect of the threshold determination of relevance. Therefore, the court concluded, a defendant's evidence of past criminal conduct by another person must be "of such nature that it would be admissible if that person were on trial for the present offense." Savino, 567 So.2d at 894. In other words, to be relevant and admissible a defendant's similar-fact evidence must evince the same quantum of similarity as that required of similar-fact evidence offered by the State.
Although it is possible to debate the Savino court's premise that the similarity requirement is a component of relevance, I accept it for these purposes. Still, I fret over the court's ultimate conclusion because its reasoning was faulty in another important way: its concept of relevance was incomplete. Certainly, evidence is relevant if it tends to prove a material fact. But evidence also is relevant if it tends to disprove a material fact. See § 90.401, Fla. Stat. (1995). The Savino court's oversight in this regard was especially significant because the respective undertakings of the parties in a criminal trial are very different. On the one hand, the State must establish the identity of the perpetrator. More precisely, it must prove beyond a reasonable doubt that it was the defendant who committed the crime. On the other hand, the defendant need not prove the identity of the perpetrator. Nor, for that matter, must he actually prove that he did not commit the crime. Rather, his endeavor-and his entitlement-is to "disprove" his involvement merely by showing that there is a reasonable doubt that he was the perpetrator.
For this reason, I think the Savino court was mistaken to impose the same test of relevance on a defendant's similar-fact evidence as that applicable to evidence the State might offer in a trial of the alleged third-party perpetrator. The issue to which the defendant's evidence relates is not whether the third party committed the offense, but whether facts implicating the third party cast reasonable doubt on the defendant's own guilt. By definition, evaluating evidence for its tendency to cast reasonable doubt on a fact entails a less exacting standard than that which measures whether evidence tends to prove a fact.
Here, the evidence Palazzolo sought to introduce regarding past similar conduct by the victim's father tended to cast reasonable doubt on the identification of Palazzolo as the perpetrator, especially in light of the testimony suggesting that the crime occurred on a day when the victim was in the care of her father and not Palazzolo. Accordingly, I consider this evidence relevant and admissible. Were it not for Savino, I simply would remand for a new trial with directions that Palazzolo be permitted to present his reverse similar-fact evidence to the jury.
NOTES
[1] We decline to discuss in detail several issues. First, the trial court did not err in refusing to grant a judgment of acquittal on the issue of identity. Second, although the State's cross-examination of Mr. Palazzolo's alibi witness was misleading and did not reflect its own decision to change the alleged date of the offense, the problems created by that cross-examination did not compel the trial court to grant a mistrial. Hopefully, the State will not repeat this cross-examination on retrial. Finally, in the context of allowing the State to prove flight, the trial court did not commit harmful error in allowing testimony indicating that Mr. Palazzolo "refused" to make a statement to the police at the time he fled.
[2] He also claims that he was entitled to a grand jury indictment. We note that his arguments would also apply to first-degree murder cases in which the State does not seek the death penalty. See § 913.10, Fla. Stat. (1997); Fla. R.Crim. P. 3.270.
[3] The standard instruction is not well prepared to deal with digital penetration cases. In such cases, the applicable standard instruction states: "(Defendant) committed an act upon (victim) in which the [anus] [vagina] of (victim) was penetrated by an object." Fla. Std. Jury Instr. (Crim.) 167. It may be useful in digital penetration cases to replace the phrase "an object" with "one or more of the defendant's fingers."
[4] Actually, S.G. was the cousin of the child's father, but she called him "Uncle."
[5] In State v. Savino, 567 So.2d 892 (Fla.1990), the supreme court rejected the argument that the standard for similarity should be relaxed for reverse Williams rule evidence used to prove the identity of another perpetrator. The court did recognize, however, that it was less likely prejudice would occur when evidence of other crimes is sought to be introduced by a defendant. To a large degree, it is the potential for unfair prejudice that restricts what is regarded as legally relevant Williams rule evidence. Almost all Williams rule evidence can be said to be logically relevant in that human experience suggests that if a defendant has committed a crime in the past, the defendant is more likely to commit another crime of the same general sort in the future. We expect recidivism among criminals. See Johnson v. State, 595 So.2d 132 (Fla. 1st DCA 1992) (discussing logical and legal relevance); Anderson v. State, 549 So.2d 807, 812-13 (Fla. 5th DCA 1989) (Cowart, J., dissenting). It is precisely this human experience that creates a high potential for unfair prejudice to the defendant. See Heuring v. State, 513 So.2d 122 (Fla.1987); Drake v. State, 400 So.2d 1217 (Fla.1981). Given the supreme court's recognition in Savino that reverse Williams rule evidence has a lower potential for prejudice to the State than standard Williams rule evidence has to the defendant, we believe that the trial court has somewhat less discretion to exclude reverse Williams rule evidence.