MORRIS, Judge.
Darren Corbett appeals his convictions for kidnapping and robbery with a deadly weapon. Based on the analysis that follows, we affirm his convictions. We write to explain our rejection of Corbett’s arguments regarding the admission of Williams[1] rule evidence and a scrivener’s error in the information.
I. Background
Corbett was charged with committing the offenses of kidnapping, sexual battery, and robbery with a deadly weapon against his ex-girlfriend, Jane Doe,[2] on November 27, 2008. The State filed a notice of intent to introduce Williams rule evidence that Corbett committed similar offenses against Mary Smith, and Corbett filed a motion to strike that evidence. At a hearing on the issue, the State pointed out that the trial court had admitted evidence of the crimes against Doe in case 2009-CF-00017, the State’s earlier prosecution against Corbett for the offenses committed against Mary Smith.[3] Corbett argued that the crimes committed against Smith were dissimilar to the crimes committed against Doe and that any probative value of the Williams rule evidence was outweighed by undue prejudice. The trial court ruled that the Williams rule evidence was admissible.
*967 At trial, the State presented the testimony of the victim in this case, Doe. She testified, as discussed in further detail below, that Corbett committed the charged offenses against her on November 27, 2008. Smith testified, also discussed .in further detail below, that Corbett committed similar offenses against her on January 1, 2009. The responding deputy testified that Doe was crying and had a mark under her eye. Another deputy testified that she went with Doe to the hospital and that the nursing staff handed the deputy a rape kit, which the deputy placed into property and evidence. A third deputy testified that he responded to Corbett’s residence and that Corbett denied committing the offenses against Doe. The crime scene technician testified that he was not able to lift any fingerprints from Doe’s vehicle. A DNA analyst testified that sperm found on a vaginal swab taken from Doe matched Corbett’s DNA profile.
The defense did not present any evidence at trial. The trial court denied Cor-bett’s motion for judgment of acquittal, and the jury returned verdicts of not guilty of sexual battery, guilty of kidnapping, and guilty of robbery with a deadly weapon. The trial court sentenced him to concurrent sentences of life in prison.
II. Williams rule evidence
A. Jane Doe’s testimony
At trial, Doe testified that she was in a relationship with Corbett from September 2007 to October 2008. She had ended the relationship but tried to remain friends. On November 27, 2008, Thanksgiving Day, Corbett called her and asked her to come see his mother who had just returned home from an assisted living facility in Palmetto. Doe finally agreed to visit Cor-bett’s mother, but she told Corbett that she could not stay long because she had other plans in Arcadia with her family and friends. Corbett was upset that Doe could not spend more time in Palmetto. Doe testified that Corbett wanted to talk about their relationship and was agitated that she did not have the time for him. On her drive to Palmetto, she turned around twice, but she finally decided to go see Corbett’s mother.
When Doe arrived at Corbett’s mother’s house, Corbett walked up to her car and asked her to take him to the store for his mother. She agreed because she was tired of arguing with him. She allowed him to drive her car, but then he drove in a direction opposite from the store. He drove her to a metal warehouse with a parking lot, a location where they had a history of going to have sex in the car. Corbett was mad because they had been arguing. He twice demanded that she get into the back seat, so she complied, and he put on black gloves and pulled out a knife. It looked like a carving knife about twelve to thirteen inches long. He put the knife to her throat and said, “Now the fun’s going to begin.” He ordered her to take her clothes off, and he had sex with her against her will.
Doe then tried to sit up, but Corbett pushed the knife to her, throat and asked, “Do you think this is a f — ing game?” He then began to talk about the pain that he was going through, wondering why they could not be in a relationship together. He went from one subject to another, talking about his mother and things that had happened in the past. She tried to sit up again, and he slapped her. He told her that they were going to the ATM to get some money so they could get high, and he told her to get in the front seat. He allowed her to put on her shirt.
When Doe got in the front seat, Corbett reclined her seat to the lowest position and fastened her seat belt. He used her ATM card to obtain money from a Bank of America ATM, and he returned to an area *968 near his mother’s house, where he bought crack cocaine. He took Doe to the shed behind his mother’s house, and he started smoking the crack. He told her to sit on the bed, and he laid the knife on a bucket or stand right next to where he sat in a chair. He told her that she was going to feel his pain and smoke crack that night. She refused, and he tried to put the crack pipe in her mouth. Corbett got mad and told her to undress and lie down on the bed. She complied, and he stood over her and nudged her legs with his knee. After he stood there for a minute, he walked outside. When he walked back inside, he told her to put her clothes back on, which she did. She was crying and cold.
At one point, Corbett accused Doe of using her cell phone to call someone. He had taken her phone earlier and had taken the battery out. She told him that she could not have called someone. They got back into her car, with him driving, and he still had the knife. Her passenger seat was still reclined. They drove around, and she tried to keep up communication with him. He continued to talk about the pain he had been in and wonder why they could not be together. He became agitated again and threatened to sell her to a Mexican work camp. She told him that he could get more money out of her account at the ATM, so they went back, and he withdrew another $150.
Corbett then drove them back towards his mother’s house, where he bought more crack. He took her back to the shed, and he continued to talk. He smoked more crack. At this point, it had been hours. Corbett finally said that “in the next 15 minutes I’m going to let your night of terror end.” She did not know what that meant, but about fifteen minutes later, he told her to pick up her phone and he walked her to her car. He told her he was going to get his niece’s Lexus and drive to the waterfront and that there was where she could tell the police to find him. But then he said, “no, actually, I’m going to sit right here” and “now go tell the police whatever you need to tell them.” He opened the door and handed her the keys. She tried to drive away, but he stood in the way for a moment. He moved, and then she immediately drove to the nearest police station. Doe testified that she never tried to escape because she was terrified and did not know what was going to happen.
The doors of the police station were locked, so she called 911. A deputy arrived at her car, and she told him what happened. She was completely distraught and terrified. She filled out an affidavit, and then two deputies took her to the hospital, where she was examined.
B. Mary Smith’s testimony
Smith testified that she was in a romantic relationship with Corbett’s sister. Around 1:15 p.m. on December 31, 2008, New Year’s Eve Day, Smith was visiting a friend near Corbett’s mother’s house. Corbett waved from his mother’s porch and then walked over and joined Smith’s conversation with her friend. He did not say much, just asked what was going on with her and his sister and how she was doing. Smith told him everything was fine and that she was doing fine. She said she was on her way to work, and he said that they needed to talk. She said okay, and that was the end of the conversation.
Smith got off of work at around 2 a.m., early New Year’s Day morning. She drove to her house, and as soon as she turned onto her street, she noticed that her laundry room light was on. She called her son to ask if he had been there that day, and he said no. She parked her car right in front of her door, went inside the house and straight into the laundry room, and turned off the light. She walked to *969 her bedroom and went to pull on the light, and she could see a figure to the left of her. As she turned around, a man covered her face, put a knife to her throat, and told her not to scream. It was a kitchen, steak-type knife.
The man told her to cooperate, and when he pulled his hand from her face, she pleaded with him to not hurt her. She did not know at that time who the man was because he was wearing a black ski mask and a hoodie. He told her to fully undress and lie on the bed nude. He told her to roll over to her stomach, and he came over to her and “touched” and “rubbed.” He allowed her to use the bathroom but then led her back to her bed.
Then, they began to talk. She asked if she had done anything wrong, and there was a lot of conversation. It went on for hours. At one point, the man asked her for money. She offered to take him to Amscot to cash her paycheck, but they went to a bank instead. Before they left, he shredded a white t-shirt, tied her hands together, and let her put on a robe. He covered her face and guided her to the car. He had her get in through the driver’s side into the passenger side seat. “He let the seat all the way back so the head part of it was in the back seat, and he put the seat belt on.”
He asked for her ATM card, and the PIN she gave him was wrong. He became agitated, and she said he was using the wrong card and gave him the correct card. He withdrew $50 from the ATM and drove them back to her house. They went back inside to her bedroom, and he removed the ties from her hands and the cover from her face. They talked again, and she told him that she was willing to hear his story since he seemed to want somebody to hear what he had to say. They talked about his family and her girlfriend. At one point in the conversation, he told her that he would reveal himself to her before he left, so she tried to do whatever it took for him to trust her. Before the man left her house, he let her feel the texture of his hair. Then he removed the top part of his hood-ie and lifted his mask, and she recognized him as being Corbett. He apologized to her for making her part of his addiction. Smith testified that “[h]e asked me when I leave would you call the police and tell them I’m sitting in my mom’s yard.”
C. Discussion
On appeal, Corbett claims that the trial court erred in admitting Williams rule testimony that Corbett had committed similar offenses against Smith. He contends that the offenses committed against Smith were unrelated and dissimilar to those in the instant case and that such evidence was impermissible proof of bad character and propensity. He argues that evidence of subsequent crimes is less probative than evidence of prior crimes and that any probative value was outweighed by the prejudice against him.
We review the trial court’s decision to admit the Williams rule evidence for abuse of discretion. See McWatters v. State, 36 So.3d 613, 628 (Fla.2010). A court “considers both similarities and dissimilarities between the collateral crimes and the charged offense when reviewing whether ‘a sufficiently unique pattern of criminal activity [justifies] admission’ ” under section 90.404(2)(a), Florida Statutes. McWatters, 36 So.3d at 627-28 (alteration in original) (quoting Peek v. State, 488 So.2d 52, 55 (Fla.1986)). “ ‘There must be identifiable points of similarity which pervade the compared factual situations.’” Peek, 488 So.2d at 55 (quoting Drake v. State, 400 So.2d 1217, 1219 (Fla.1981)). “ ‘Given sufficient similarity, in order for the similar facts to be relevant, the points of similarity must have some special character or be so unusual as to point to the *970 defendant.’ ” Id. (quoting Drake, 400 So.2d at 1219).
“[0]ther crime evidence that is probative of a material fact in issue is not inadmissible simply because it has a tendency to suggest the commission of another crime and thus necessarily is prejudicial to the defendant.” Williams v. State, 621 So.2d 413, 415 (Fla.1993) (citing Bryan v. State, 583 So.2d 744, 747 (Fla.1988), and Williams, 110 So.2d at 660). Other crime evidence that is sufficiently similar to the charged crimes may be admissible to rebut a defense of consent by showing a common plan or scheme. See id. at 416-17.
After considering the testimony by both Doe and Smith, we conclude that the trial court did not abuse its discretion in admitting Smith’s testimony. The following similarities pervade the two separate incidents and are so unusual as to point to Corbett: (1) Corbett knew both victims; (2) both offenses took place on a holiday; (3) Corbett threatened both victims with a knife; (4) Corbett made both victims undress and stay undressed; (5) Corbett forced both victims to ride in the passenger seats with the seats fully reclined; (6) Corbett drove both victims to ATMs where he withdrew money from their accounts; (7) Corbett spent several hours with both victims, talking to them about his life and problems; and (8) Corbett finally let both victims go and told them where the police could find him. While there were some dissimilarities between the two incidents, the uniqueness of the striking similarities outweighs the differences. See McWatters, 36 So.3d at 628-29. The evidence in this case was similar and unique enough to constitute “‘fingerprint’ evidence.” Fitzsimmons v. State, 935 So.2d 125, 128 (Fla. 2d DCA 2006).
While the Williams rule evidence offered in this case involved offenses committed subsequent to the charged offenses, this does not render the evidence inadmissible. The evidence showed that Corbett committed the instant offenses against Doe on Thanksgiving Day 2008. The offenses committed against Smith occurred on New Year’s Day 2009, just over a month later. The time in between the crimes did not render the Williams rule evidence irrelevant in light of the other strong factors that render the evidence relevant. See Kent v. State, 704 So.2d 121, 124 (Fla. 1st DCA 1997) (“[T]he admissibility of subsequent acts depends heavily on its probative value and prejudicial effect, which the trial court must balance.”); cf. State v. Drolet, 549 So.2d 1172, 1172 (Fla. 2d DCA 1989) (“Evidence of acts approximately six months subsequent to the time of the charged crimes was not relevant to prove predisposition to commit those crimes.”). Corbett claims that the similar fact evidence was not relevant to prove Corbett’s state of mind at the time of the Thanksgiving Day offenses, but the evidence was not offered for that purpose. It was offered to prove a common plan or scheme and to rebut Corbett’s defense of consent.
Corbett also claims that the evidence was unduly prejudicial and that its probative value was outweighed. But the simple fact that the evidence was prejudicial against Corbett did not render it inadmissible. See generally Amoros v. State, 531 So.2d 1256, 1260 (Fla.1988) (“[Almost all evidence to be introduced by the state in a criminal prosecution will be prejudicial to a defendant.”). And the probative value of the evidence offered by Smith was not outweighed by any prejudicial effect of her being a sympathetic or emotional witness, especially where her testimony was necessary to describe the similar fact evidence, the State did not admit more evidence than was necessary to prove the similar fact evidence, and the State only referred to her testimony once during closing arguments. See Delhall v. State, 95 So.3d 134, *971 166 (Fla.2012) (recognizing that “ ‘relevant evidence of collateral crimes impermissibly becomes a feature of the trial when the evidence transcendfs] the bounds of relevancy to the charge being tried and the prosecution devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant’” (alteration in original) (quoting McCray v. State, 71 So.3d 848, 877 (Fla.2011)) (internal quotation marks omitted)).
III. Misspelling of victim’s name in the information
In his second point on appeal, Corbett claims that the information erroneously listed the victim’s last name. This argument was not preserved below, and even if it had been, it would not amount to a reversible error. Only “a material variance between the name alleged [in the charging document] and that proved is fatal.” Snipes v. State, 733 So.2d 1000, 1004 (Fla.1999) (citing Fla. R. Crim. P. 3.140(o) and Raulerson v. State, 358 So.2d 826 (Fla.1978)). “[T]he name of the victim as set forth in the [charging document] must be specific enough so as to not mislead the accused in the preparation of the defense or to subject the accused to a second prosecution for the same offense.” Id.
The information misspells the victim’s last name by one vowel. But defense motions filed by Corbett correctly spell the victim’s last name, indicating that Corbett was aware of the correct identity of the victim. The written order allowing the admission of Williams rule evidence entered in case 2009-CF-17 correctly identifies the victim in this case, further informing Corbett of the correct identity of the victim. And the transcript of the trial in this case correctly spells the victim’s last name. Further, on the stand, the victim spelled her name. Therefore, Corbett’s defense was not hampered and there is no risk of Corbett’s being placed in double jeopardy. Accordingly, there is no error in the information that would entitle Cor-bett to a reversal. See Snipes, 733 So.2d at 1005 (holding that misspelling of the victim’s name in the indictment should be excused where “there was no issue regarding whether the victim in this case was in fact Karl Markus Mueller” and “[w]here [defendant] was not prejudiced” by the error because “it did not hamper the preparation of his defense or place him in jeopardy of being tried twice for the same offense”); Brown v. State, 888 So.2d 130, 131 (Fla. 4th DCA 2004) (denying petition alleging ineffective assistance of counsel for failing to raise defect in the information because the variance regarding the name of the victim was not fatal; “there could be no doubt as to the true identity of the victim” because the victim himself testified at trial, and there was no “possibility of a second prosecution for the same offense”); cf. Jacob v. State, 651 So.2d 147, 148 (Fla. 2d DCA 1995) (where information identified the victim as James Neeley, the arresting officer testified at trial that he interviewed a Joseph Neeley as the victim, and the victim did not testify at trial, court was “unable to infer that these are two names for the same person” and held that the defendant remains in jeopardy of being “convicted twice for the same offenses”).
IV. Conclusion
For the reasons expressed above, we affirm Corbett’s convictions.
Affirmed.
WALLACE and BLACK, JJ., Concur.

. Williams v. State, 110 So.2d 654, 663 (Fla.1959); see § 90.404(2)(a), Fla. Stat. (2008).

. We use pseudonyms to refer to the victims in both cases out of respect for their privacy.

. In case 2009-CF-17, Corbett was convicted after a jury trial of burglary of a dwelling with an assault or battery, armed kidnapping with a weapon, and robbery with a weapon against Smith. On direct appeal, he argued that the trial court improperly admitted Williams rule evidence that he had committed similar offenses against Doe. This court per curiam affirmed his convictions. See Corbett v. State, 67 So.3d 208 (Fla. 2d DCA 2011) (table decision).