IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

VERNON BERNARD MOSS,

      Appellant,

v.

STATE OF FLORIDA,

      Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D14-421

Opinion filed July 1, 2015.

An appeal from the Circuit Court for Alachua County.
Ysleta W. McDonald, Judge.

Nancy A. Daniels, Public Defender, and M.J. Lord, Assistant Public Defender,
Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Justin D. Chapman, Assistant Attorney
General, Tallahassee, for Appellee.

RAY, J.

      Vernon Bernard Moss appeals his conviction for burglary of an occupied

dwelling and sexual battery. We find reversible error in the admission of evidence

of a collateral offense and evidence that Moss exercised his right to remain silent.

Consequently, we reverse and remand for a new trial.

**FACTS**

According to the State's evidence, Moss committed the charged offenses on December 20, 2012, while working in maintenance at the Verdant Cove apartment complex. R.L., a resident, saw Moss outside and asked him to come into her apartment to trim some vertical blinds. R.L. asked if she needed to place a request with the management office, and Moss indicated that she did not. He went by a short time later and completed the job. When Moss finished trimming the blinds, R.L. was standing in her kitchen making a sandwich for her four-year-old daughter, who was in the open adjoining living room. With the young child essentially in the same room, Moss approached R.L., made an unwelcomed comment about her body, and attempted to put his hands in her pants. R.L. physically blocked the attempt and told Moss to "get the fuck out of [her] house." Instead of leaving, Moss grabbed R.L.'s hand and said twice, "[L]et me show you something I can fix in your bathroom." When R.L. indicated she did not want to go, Moss picked her up, threw her over his shoulder, and carried her into the bedroom as she screamed. He locked the door and performed oral and vaginal sex on R.L. against her will.

The police interviewed Moss the same day as the incident. During this interview, the officer suggested that Moss and R.L. may have engaged in consensual sex, but Moss denied any sexual contact with her at all. At the end of

the interview, the officer advised Moss that if he did have sex with R.L., the information would come out because R.L. was undergoing a sexual assault examination, which could reveal DNA evidence.

A few months later, after confirming that Moss's DNA was found inside the victim, the police attempted a second interview with Moss. An officer read Moss his Miranda[1] rights and asked, "Having these rights in mind, do you wish to talk to us now, or at least listen to what we have to say?" Moss answered, "I'll listen to what you've got to say." The officer then asked Moss if he recalled the prior interview and having denied any contact with R.L. Moss confirmed, "That's correct." The officer responded, "Okay. Is –now, that's—is that your—you still maintain that you never—," at which point Moss interrupted with, "That's my final statement." The officer proceeded, stating, "Okay. That you never had any contact with her?" Moss confirmed, "That's what I'm saying."

This second interview was admitted into evidence over the defense's objection that it amounted to an improper comment on Moss's invocation of his right to remain silent. Although the interview went on (resulting in a statement that the prosecutor agreed was an invocation of the right to remain silent), the portion the jury heard was approximately two minutes long and is summarized in this opinion in its entirety. In the State's closing argument, the prosecutor characterized

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

the significance of Moss's comments as showing that he lied after having three months "to think about this," after knowing that the police had taken a DNA sample from him, and after being arrested for rape.

The trial court also admitted evidence of a collateral crime by Moss. The collateral crime witness, M.A., testified that she was living at the Verdant Cove apartment complex on November 10, 2012, when she saw Moss outside and asked him to replace a lightbulb in her apartment. Moss entered her apartment, replaced the bulb, and then approached M.A. from behind while she was standing in her kitchen preparing food. Moss placed his hands on M.A.'s chest and asked if her breasts were real, at which point she pushed him back and told him to "get the fuck out of [her] apartment." Moss replied, "That's how it is?" and left.

Moss objected to the admission of M.A.'s testimony on the ground of relevance. The trial court concluded that this evidence was relevant to show lack of consent or mistake and modus operandi. At trial, the court instructed that the evidence could be considered to show "intent or the absence of mistake or accident on the part of [Moss]." To the jury, the prosecutor argued that M.A.'s testimony showed "the way [Moss] preys on women." The prosecutor suggested that Moss was "probably empowered by the fact that there were no consequences for what happened to [M.A.], and so he went the further step with [R.L.]."

4

On behalf of the defense, Moss testified that he had consensual sex with R.L., for which he had agreed to pay her, after entering her home for the purpose of fixing her blinds. He explained that he lied to the police because he did not want his wife to find out about his infidelity. He stated that he maintained his denial because he hoped R.L. would eventually change her story.

## ANALYSIS

### I. Collateral Crime Evidence

The first argument we address is that the trial court reversibly erred in admitting evidence of the offense against M.A. A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion, subject to the rules of evidence. Donton v. State, 1 So. 3d 1092, 1093 (Fla. 1st DCA 2009).

Section 90.404(2)(a), Florida Statutes (2013), known as the Williams[2] rule, addresses the admission of collateral crime evidence:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

This rule is "a special application of the general relevancy rule for [a] collateral crime," Wright v. State, 19 So. 3d 277, 292 (Fla. 2009), which describes ways in

---

[2] Williams v. State, 110 So. 2d 654 (Fla. 1959).

5

which collateral crime evidence may be relevant to specific issues in a trial. Although the rule addresses "similar fact evidence," mere similarity to the charged offense does not ensure the relevance or admissibility of collateral crime evidence. Charles W. Ehrhardt, Florida Evidence § 404.9 (2013 ed.); see Bolden v. State, 543 So. 2d 423, 423 (Fla. 5th DCA 1989) (emphasizing that evidence should not be admitted merely to show a pattern of conduct). Likewise, lack of similarity in itself does not require exclusion of evidence of a collateral offense that is relevant to a material issue. McLean v. State, 934 So. 2d 1248, 1258 (Fla. 2006). The Williams rule addresses similarity because the relevance of collateral crime evidence is "often a function of its similarity." Id. at 1255.

Evidence of a similar collateral crime sometimes shows absence of mistake because "[t]he more frequently an act is done, the less likely it is that it is innocently done." Vice v. State, 39 So. 3d 352, 357 (Fla. 1st DCA 2010). With exceptions not pertinent to the instant case,[3] where collateral crime evidence is offered for this purpose, it must be "strikingly similar" to the charged offense to be admissible. Robertson v. State, 829 So. 2d 901, 909 (Fla. 2002). Generally, the main crime at issue and the similar fact evidence must share "some unique characteristics or combination of characteristics [that] set them apart from other offenses." Id. (quoting Heuring v. State, 513 So. 2d 122, 124 (Fla. 1987),

---

[3] See § 90.404(2)(b), (c), Fla. Stat. (2013).

6

superseded by statute on other grounds, § 90.404(2)(b), Fla. Stat. (2002), as stated in McLean, 934 So. 2d at 1258). This requirement of substantial similarity has been imposed not only because the logical relationship between the similarity and the issue of absence of mistake justifies it, see Vice, 39 So. 3d at 357, but also because evidence of a collateral crime carries a high risk of a wrongful conviction based on the defendant's character or propensity to commit crimes, see Heuring, 513 So. 2d at 124.

When it is argued that evidence of a collateral crime tends to prove a material issue due to its similarity to the charged offense, the trial court should consider both similarities and differences between the crime being tried and the similar fact evidence. See Tollefson v. State, 525 So. 2d 957, 960 (Fla. 1st DCA 1988) (collateral crime evidence inadmissible where differences between the two scenarios overshadowed their "singular similarity"); Beaussicot v. State, 95 So. 3d 472, 474 (Fla. 4th DCA 2012) (two offenses not strikingly similar where significant differences existed); Nshaka v. State, 82 So. 3d 174, 179 (Fla. 4th DCA 2012) (similarities between offenses were substantially outweighed by dissimilarities); see also Corbett v. State, 113 So. 3d 965, 970 (Fla. 2d DCA 2013) (collateral crime evidence admissible as "fingerprint evidence" where striking similarities outweighed differences). If the collateral crime evidence involves a different victim and is offered to prove absence of mistake, differing degrees of

severity between the two offenses, or completion of the main crime at issue versus a mere threat to commit a similar crime in the collateral scenario, are important considerations. See Robertson, 829 So. 2d at 910 (holding defendant's prior threat of violence against ex-wife with an assault rifle was not sufficiently similar to the fatal shooting of defendant's current wife with a handgun to justify admission under the Williams rule).

Here, the trial court found the collateral crime evidence relevant to show lack of consent and modus operandi, which, under the facts of this case, are both ways of saying absence of mistake.[4] Although there are clear similarities between the two offenses described in the State's evidence, the crime against M.A. is not similar enough to the distinct crime against R.L. to provide a sufficient basis from which the jury could find that Moss was not mistaken in any belief he may have held that R.L. consented to sexual intercourse. Other evidence provided that basis, but M.A.'s testimony did not. M.A. described a simple battery that Moss stopped when she pushed him away and verbally protested. Although the battery M.A. reported was of a sexual nature, it was substantially less severe than the two sexual batteries[5] detailed in R.L.'s testimony. Perhaps most importantly, the two scenarios

---

[4] Modus operandi is typically relevant to show identity. See, e.g., Drake v. State, 400 So. 2d 1217, 1219 (Fla. 1981).

[5] Although only one sexual battery was charged, the two distinct acts could have given rise to two separate charges. See State v. Meshell, 2 So. 3d 132, 135 (Fla.

are significantly distinguishable due to Moss's acquiescence to M.A.'s protest in comparison with R.L.'s description of his extreme escalation of the offense against her, by throwing her over his shoulder, carrying her to the bedroom, locking the door, and sexually battering her, after she protested in the exact same way as M.A.

The two incidents are similar in terms of the opportunities Moss exploited and the manner in which he approached the women, but they are quite different on the crucial issue of what Moss did when his unprovoked and unwelcomed actions were rejected. The actions that followed this rejection, not the initial attempt to touch R.L., led to the charge of sexual battery, and M.A.'s testimony is not probative of Moss's intent with regard to those actions. M.A.'s testimony establishes only that Moss has a propensity to touch women's bodies offensively, without their consent. This type of propensity evidence is inadmissible and presumptively harmful. See Vice, 39 So. 3d at 355. Because we are not convinced beyond a reasonable doubt that this presumptively harmful evidence did not affect the verdict, we reverse. See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

## II. Evidence of Invocation of the Right to Remain Silent

Moss's additional argument, that the court erred in admitting the redacted

---

2009) (holding "the sex acts proscribed in section 800.04(4) (oral, anal, or vaginal penetration) are of a separate character and type requiring different elements of proof and are, therefore, distinct criminal acts," each of which may be the subject of a separate conviction).

recording of the second interview, provides another ground for reversal. Our supreme court has emphasized that "[i]t is constitutional error to penalize an individual for exercising the Fifth Amendment privilege" and that "the prosecution may not introduce during trial the fact that an individual has relied upon this protection in the face of accusation." Ventura v. State, 29 So. 3d 1086, 1088 (Fla. 2010). This proscription extends to both evidence of the exercise of that right and comments concerning such exercise. State v. Smith, 573 So. 2d 306, 317 (Fla. 1990). In fact, any comment or evidence even fairly susceptible of being interpreted as indicating the exercise of this right is improper. Coleman v. State, 58 So. 3d 324 (Fla. 1st DCA 2011) (quoting State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986)).

Under these principles, a defendant's affirmative statement that he will not talk to police must be excluded from evidence at trial. Carlisle v. State, 40 Fla. L. Weekly D1075 (Fla. 2d DCA 2015); see also Mack v. State, 58 So. 3d 354, 355-56 (Fla. 1st DCA 2011); Ash v. State, 995 So. 2d 1158, 1158-59 (Fla. 1st DCA 2008); accord Ventura, 29 So. 3d at 1089 ("[A]ny comment—direct or indirect—by *anyone at trial* on this right is constitutional error that should be avoided."). Similarly, and analogous to the evidence at issue here, a comment by a prosecutor that the defendant has not before offered the explanation of events he offers at trial is improper. Chamblin v. Sate, 994 So. 2d 1165, 1167-68 (Fla. 1st DCA 2008)

10

(reversing due to prosecutor's comment that defendant, accused of DUI manslaughter, had "waited a year" to blame the victim); see also Floyd v. State, 129 So. 3d 1214, 1214-15 (Fla. 1st DCA 2014) (finding "clearly" improper a prosecutor's questioning of the defendant as to why he did not speak to police before trial to tell them he acted in self-defense, as he claimed during his trial testimony).

Under the circumstances presented in this case, Moss's remark to the detective that he would listen to the detective (and not necessarily talk to him), soon followed by an assertion that his prior interview was his "final statement" is at least fairly susceptible of being interpreted as an exercise of his right to remain silent. The recording at issue is brief, at approximately two minutes long, and essentially begins and ends with Moss's refusal to give a new statement. It contains no clear waiver of the right to remain silent and no substantial interaction between the officer and Moss before or after Moss's announcement that he has given his "final statement."[6] The fact that the recording ends shortly after this announcement

---

[6] Moss's responses to the detective may not have been enough to invoke his right to remain silent and require questioning to cease after a valid waiver of the right. See Alvarez v. State, 15 So. 3d 738, 743 (Fla. 4th DCA 2009) (recognizing that once a defendant validly waives his Miranda rights, an attempt to re-assert those rights within the same interaction must be clear and unequivocal). This case, however, is not one where a defendant validly waived his right to remain silent and argues that he later asserted the right before ultimately making incriminating statements that the State hopes to introduce into evidence. E.g., Bailey v. State, 31 So. 3d 809, 815-16 (Fla. 1st DCA 2009) (upholding trial court's finding that

11

itself suggests that the announcement was an assertion of the right to remain silent. While parts of the brief interaction could be interpreted as substantive denials of contact with the victim, overall, the interaction is more susceptible of being interpreted as an attempt by Moss to exercise his right against self-incrimination.

The prosecutor attempted to walk a fine line between (1) emphasizing that Moss continued to lie despite knowing of the DNA test and having time to reflect on his previous statement and (2) arguing that Moss, if innocent, should have spoken up and provided an explanation when confronted with the DNA evidence. Despite this effort, the implication of guilt created by this evidence arises much more from the decision not to make further comments until the time of trial, when Moss raised a never-before-asserted defense, than from the cumulative point that Moss lied to the police about sexual contact with the victim. The fact that Moss lied once was relevant; the fact that he lied a second time, only marginally so. The more significant, but legally improper, point to be drawn from the second interview is that Moss changed course and invoked his right to remain silent after

---

ambiguous statement by defendant that he did not "really want to talk about that" was insufficient to trump prior clear waiver of right to remain silent). It is also not a case where the defendant selectively refused to answer one substantive question among many in a voluntary interview. E.g., Hudson v. State, 992 So. 2d 96, 110-11 (Fla. 2008) (opining that prosecutor's comments concerning defendant's refusal to implicate another person during a voluntary interview did not amount to a comment on defendant's right to remain silent, as defendant had not exercised the right).

12

the DNA test results were in and he was confronted by police a second time. From the exercise of Moss's right to remain silent, the jury could have inferred that Moss essentially admitted he was caught.

Because we are unable to conclude that the admission of the redacted recording of the second interview was harmless beyond a reasonable doubt, Appellant is entitled to a new trial. See DiGuilio, 491 So. 2d at 1135.

## CONCLUSION

For the foregoing reasons, we are compelled to reverse Moss's convictions for burglary and sexual battery and remand for a new trial.

REVERSED and REMANDED.

MARSTILLER and SWANSON, JJ., CONCUR.