NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

ROBERT NEWBY,

      Appellant,

v.                         Case No. 2D17-228

STATE OF FLORIDA,

      Appellee.

Opinion filed May 29, 2019.

Appeal from the Circuit Court for Pinellas
County; Thane B. Covert, Judge.

J. Andrew Crawford of J. Andrew
Crawford, P.A., St. Petersburg, for
Appellant.

Ashley Moody, Attorney General,
Tallahassee, and Michael Schaub,
Assistant Attorney General, Tampa, for
Appellee.


SALARIO, Judge.

      Robert Newby appeals from his judgment and sentence rendered after a

jury found him guilty of burglary—in this case, a first-degree felony because the burglary

involved the battery of a woman inside the home. Mr. Newby's sole defense at trial was

that he was not the intruder, and the evidence on that issue was not at all conclusive.

On appeal, Mr. Newby correctly asserts that the trial court erred by refusing to admit so-called reverse Williams[1] rule evidence that another person had committed a burglary with a battery in the same area in a strikingly similar manner. The trial court should have let this evidence in, and on the facts of this case, we cannot excuse the error as harmless. We reverse and remand for a new trial or other proceedings consistent with this opinion.

### Someone Attacks E.F. In Her Home

On January 3, 2014, E.F. was the victim of a terrifying attack at her home in Dunedin. E.F. was forty-three years old and lived alone in a small house. Around 11:30 p.m. on the night of January 2, she came home from working at a local restaurant and went straight to bed. Her front door was locked when she went to sleep. A few hours later, around 3:00 or 3:30 a.m., she was awakened by a loud bang. Almost immediately, she heard another loud bang and saw a man wearing a dark ski mask running through her half-open bedroom door.

The man ran for E.F.'s bed and jumped on her as she laid there. She fought back, kicking and pinching her attacker. The man repeatedly tried to push her head to the side, leading E.F. to think that he was trying to stop her from looking at him. She tried to bite his right hand. The man then put his hands around E.F.'s neck with force. She continued struggling. After about five minutes, their eyes met. The attacker jumped off E.F. and ran out the front door. E.F. followed him out and saw him turn south on the street that ran in front of her home. She then called 911.

---

[1]Williams v. State, 110 So. 2d 654 (Fla. 1959).

Because her attacker was wearing a mask, E.F. was not able to identify him or even to describe him well. She told police that he was thin and had worn a dark grey sweat jacket. She would later add that he had hazel-colored eyes, that he appeared to be white, and that his hands felt leathery, such that he may have been wearing gloves. The man had no noticeable odor.

### *Law Enforcement Focuses On And Ultimately Arrests Mr. Newby*

Members of the Pinellas County Sheriff's Office arrived at E.F.'s house shortly after her call to 911. They set up a perimeter around the major roads and intersections nearby to aid a K-9 search of the area. In the process, Lieutenant William Byrd drove by Mr. Newby, who was jogging across one such road. He was wearing boxer shorts, a T-shirt, and dress socks with no shoes. The temperature was in the forties—cold by Florida standards. That got the lieutenant's Spidey senses tingling.

Lieutenant Byrd made a U-turn and drove to meet up with Mr. Newby on the other side of the street. He got out of the car and introduced himself. He asked what Mr. Newby was doing out dressed that way in the cold weather. He noted that Mr. Newby smelled of alcohol, had watery eyes, and spoke with slurred speech—all of which led him to think that Mr. Newby was drunk. Mr. Newby said that after drinking he had been dropped off at a nearby home where he lived with his sister and her boyfriend. According to Lieutenant Byrd, Mr. Newby said that he started to undress outside, but that he then saw a car drive past that belonged to people he knew lived nearby, and that he jogged over to meet them. When he got to the house where they lived, he decided to keep jogging. He said that his clothes would be near a backpack in the front yard of his sister's home.

As Lieutenant Byrd was talking with Mr. Newby, Deputy Matthew Aitken was conducting a K-9 search of the area with a dog named Bosco. Bosco picked up a scent near the road in front of E.F.'s home, and Deputy Aitken and the dog followed it. Bosco stopped at a trash can and indicated that something was in it. Deputy Aitken opened the trash can and found a grey, hooded sweatshirt with horizontal stripes. The deputy radioed in a description of the find.

Apprised of the discovery, Lieutenant Byrd, who was still with Mr. Newby, asked Mr. Newby if he owned a grey, striped, hooded sweatshirt. Mr. Newby said he did. Lieutenant Byrd and Mr. Newby remained together at the site where Lieutenant Byrd first encountered Mr. Newby and later moved to the premises of a nearby business.

Meanwhile, Deputy Aitken and Bosco continued their search. Bosco lost the scent, and Deputy Aitken tried to get him to find it again. Unsuccessful, Deputy Aitken guided Bosco in the direction Bosco had led them before they stopped at the trash can. Bosco picked up a scent thirty to fifty yards away and began following it. At some point—we do not know whether before or after Bosco picked up the scent—Deputy Aitken learned that Lieutenant Byrd had a suspect (Mr. Newby) not far from where he and Bosco were. Bosco tracked in the direction Deputy Aitken had begun walking until the two reached a bush near the premises where Lieutenant Byrd and Mr. Newby were. The dog alerted at the bush, but a search turned up nothing. Bosco then lost the scent. The dog did not lead Deputy Aitken to Mr. Newby or locate any other clothing, gloves, ski mask, or other materials that might have been evidence of the crime.

Mr. Newby was arrested and taken to jail. Lieutenant Byrd went to the home of Mr. Newby's sister. There, in the front yard as Mr. Newby described, he found a backpack, a pair of black dress pants, and a white shirt. He went to the front door and woke up Mr. Newby's sister. Another deputy arrived with the sweatshirt that Deputy Aitken and Bosco found. He showed the sweatshirt to Mr. Newby's sister who, according to the lieutenant and deputy, identified the sweatshirt as Mr. Newby's.

Mr. Newby was charged in a one-count information with burglary with a battery under section 810.02(2)(a), Florida Statutes (2013). The case then proceeded through discovery and toward a jury trial.

### Mr. Newby's Reverse *Williams* Rule Evidence

Mr. Newby's strategy at trial was to concede that E.F. had been attacked but to deny that he did it. There were some significant differences between E.F.'s description of the person who attacked her and his own appearance upon which to base that defense. E.F. described a white male; Mr. Newby is Hispanic and brown-skinned. E.F. described light, hazel-colored eyes; Mr. Newby's eyes are brown. E.F. described someone who was "skinny" or "thin"; Mr. Newby is five-foot-nine but weighs 225 pounds, and photographs show that he has a bulkier build. E.F. did not smell anything on her attacker; Lieutenant Byrd detected an odor of alcohol on Mr. Newby. Based on these differences, Mr. Newby proceeded to trial on the theory that someone else must have attacked E.F.

To support that theory, Mr. Newby sought to admit evidence that a man named Nicholas Nardelli committed a burglary with a battery that was very similar to the attack on E.F. Mr. Newby proffered evidence of the following. On September 29, 2014—nine months after the attack on E.F.—a woman, D.W., was attacked in her home

- 5 -

in Palm Harbor, just north of Dunedin. She was fifty-two years old and lived alone in a small house. Mr. Nardelli confessed to being her attacker.[2] At the time, Mr. Nardelli was living in Dunedin, seven miles away from D.W. and four miles away from E.F. Mr. Nardelli has hazel-colored eyes. D.W. described him as being five-foot-nine and 160 pounds.

The attack on D.W. took place around 3:00 a.m. Mr. Nardelli entered her home through an unlocked back door. He was wearing dark clothes, gloves, and a dark mask. D.W. described the mask as a "ski mask," although it was later established to have come from a ninja costume. Mr. Nardelli went straight to D.W.'s bedroom and assaulted her in her bed. He told her to stop resisting him, to lie face down, and to look at the television. He put his hands around her throat and tried to turn her over to prevent her from seeing him. At some point, Mr. Nardelli ran his hands over D.W.'s groin area over her clothing. Mr. Nardelli tried to bind her wrists with zip ties. The attack lasted twenty to thirty minutes and ended when Mr. Nardelli locked eyes with D.W. and then fled from the house.

Mr. Nardelli tossed his mask into a nearby dumpster and ran to his car. He later wrecked the car, which led to his arrest for the attack on D.W. Apart from the attack on E.F., this was the only other instance of a masked male attacking a woman in her home in Pinellas County between January 2014, when E.F. was attacked, and September 2014, when D.W. was attacked.

_____

[2]There was also evidence of a burglary with a battery committed by Mr. Nardelli in 2006, but Mr. Newby's counsel stated that Mr. Newby was not seeking the admission of that evidence at the trial.

Mr. Newby filed a pretrial motion seeking a ruling that evidence of Mr. Nardelli's attack on D.W. was admissible at trial as "reverse Williams rule" evidence to support his defense that he did not attack E.F. See State v. Savino, 567 So. 2d 892, 893 (Fla. 1990) (describing "reverse Williams rule evidence" as similar fact evidence offered by a defendant to show that someone else committed the crime for which the defendant is being tried (citing Rivera v. State, 561 So. 2d 536, 539 (Fla. 1990))). The trial court denied the motion because it believed that the circumstances of the Nardelli case were not sufficiently similar to those of the attack on E.F. to warrant admission as reverse Williams rule evidence. Mr. Newby renewed his pretrial motion at the close of the evidence. The trial court adhered to its pretrial ruling.[3]

### The Trial

The sole disputed issue at trial was the identity of E.F.'s assailant. There were four main sources of evidence: (1) the testimony of people involved in the events—E.F., Lieutenant Byrd, the deputies involved in the investigation, and Mr. Newby's sister—as to what they saw, heard, and did on the morning of the attack; (2) the results of DNA testing on the sweatshirt and E.F.'s neck, hands, and fingernails; (3) the results of fingerprint analysis of E.F.'s house; and (4) Mr. Newby's own testimony.

---

[3]In fairness to the trial court, the way Mr. Newby presented his reverse Williams rule evidence was less than ideal. The facts were presented to the trial court by way of stipulation, testimony, and documents (like deposition transcripts) at various points before and during trial. At one point during a midtrial proffer, the trial court remarked with some justification that it appeared that Mr. Newby was using the proffer as discovery rather than to get facts before the court. The State has not argued that anything about Mr. Newby's presentation of the facts and issues provides an alternative ground for affirmance here, however, and under the circumstances of this case we decline to do so on our own initiative. See, e.g., Gomillion v. State, 44 Fla. L. Weekly D758, D760 n.4 (Fla. 2d DCA Mar. 20, 2019).

The testimony of the people involved in the events was consistent with the facts discussed above. The only significant addition is that Lieutenant Byrd and another deputy testified that when Mr. Newby's sister was presented with the sweatshirt, she said something like, "I'm not going to lie, that's his sweatshirt." Mr. Newby's sister testified that she could not tell whether the sweatshirt belonged to Mr. Newby and that she did not remember making the statement Lieutenant Byrd and the deputy attributed to her or identifying the sweatshirt as Mr. Newby's when they presented it to her.

The DNA evidence was inconclusive at best. DNA from a male was found on E.F.'s neck and right hand, but the DNA analyst's testing of that sample excluded Mr. Newby as a contributor. There was a possible trace contributor of DNA found on E.F.'s left hand, but there was not enough of that DNA collected to permit a comparison to Mr. Newby's (or anyone else's) DNA. No foreign DNA was detected on E.F.'s fingernails. As for the sweatshirt, the State's DNA analyst was unable to determine whether E.F.'s DNA was on the sweatshirt. He was able to determine, however, that a sample taken from the sweatshirt contained a mixture of DNA from two males, meaning that it was a certainty that a man other than Mr. Newby contributed DNA to the sweatshirt. But he could not exclude Mr. Newby as one of the contributors because the DNA profile from that sample could be expected to occur in one out of every nine Hispanic men.

The fingerprint evidence was also less than certain. There were prints on E.F.'s front and bedroom doors that did not match Mr. Newby. There was a partial palm print on E.F.'s bedroom door that did match Mr. Newby, along with other partial prints that did not match him. But that matched print was not conclusively tied to the night of the offense. It was undisputed that Mr. Newby had an on-again-off-again relationship with a woman who was acquainted with E.F. It was also undisputed that Mr. Newby

- 8 -

went with this woman to a Halloween party at E.F.'s home three months before the attack. Guests were free to go anywhere in the house, and because E.F. had just bought it, she was giving tours. The State's fingerprint examiner testified both that fingerprints can remain on a surface for a "great length of time" and that there was no way to tell when Mr. Newby left the palm print on the bedroom door. Furthermore, the palm print was stationary—meaning Mr. Newby was not moving when it was made—which was inconsistent with someone running into the bedroom as E.F. described.

Mr. Newby denied breaking into E.F.'s house and attacking her. He testified that after getting off work at a nearby restaurant at around 10:00 p.m., he went out to a couple of bars with friends. They were out until roughly 2:00 a.m. Mr. Newby had two mixed drinks and between six and eight beers. When they were done, a coworker drove Mr. Newby to his sister's house, which was fifteen to twenty minutes away. When he got home, Mr. Newby wanted to have a cigarette before bed, but he did not want to go inside and change clothes first because he feared causing his sister's dog to bark and wake his sister and her boyfriend. So he took off his work clothes outside and placed them next to his backpack.

Mr. Newby then saw a truck drive by that belonged to his sometimes-girlfriend's roommate. Believing she might be home and awake, he walked over to her house. When he got there, he saw that her bedroom light was off and decided she must have been asleep. He saw other people in front of her house who he did not want to talk with, so he took off at a jog in the opposite direction. After a while, he decided to walk by a condo he had been thinking about renting. He got disoriented and decided to head for home. On the way, he had to urinate and saw a secluded place on the other

side of the street.  As he was crossing the street there, he was intercepted by Lieutenant Byrd.

Mr. Newby was shown the sweatshirt Deputy Aitken and Bosco recovered from the trash can and testified that he believed it was his but that he did not remember there being tears or holes in it.  He said he would not have worn a sweatshirt in that condition.  He further testified that the last he remembered seeing his sweatshirt was earlier in the evening at one of the bars.  He had left the sweatshirt on a change machine, and one of his friends told him not to forget it.

The jury found Mr. Newby guilty of burglary with a battery.  The trial court sentenced Mr. Newby to twenty years in prison followed by two years of community control and another eight years of probation.  This timely appeal follows.

### The Trial Court Should Have Admitted The Reverse <u>Williams</u> Rule Evidence

Mr. Newby argues that the trial court erred by ruling that Mr. Nardelli's attack on D.W. was not sufficiently similar to the attack on E.F. and excluding his reverse <u>Williams</u> rule evidence.  We agree that the proffered evidence of Mr. Nardelli's crime was similar enough to the facts of this case to make it relevant to Mr. Newby's defense and, as a result, that the evidence should have been admitted.[4]

In its classic form, the <u>Williams</u> rule, which was first codified at section 90.404(2), Florida Statutes (1976), allows the State to introduce similar fact evidence of other crimes or acts by the defendant to prove a relevant matter in the prosecution of the crimes for which he or she is on trial.  <u>McDuffie v. State</u>, 970 So. 2d 312, 323 n.2 (Fla. 2007).  When the State seeks to admit evidence of other crimes to establish that

_____

[4]Mr. Newby has raised additional appellate arguments, but because we find the reverse <u>Williams</u> rule issue dispositive, we do not address them.

the defendant committed the offense being tried, the <u>Williams</u> rule requires, among other things, that the State satisfy a strict standard of relevance by demonstrating that there is a substantial similarity between the facts of the other crimes and the facts of the offense being tried.  See <u>Robertson v. State</u>, 829 So. 2d 901, 909 (Fla. 2002).  This prerequisite of similarity requires that the two offenses "share some unique characteristic or combination of characteristics which sets them apart from other offenses."  <u>Id.</u> (quoting <u>Huering v. State</u>, 513 So. 2d 122, 124 (Fla. 1987)).  The reason this strict standard is applied to evidence of other crimes is to reduce the risk that a defendant will be convicted based on a jury's assessment of his or her character or criminal propensity instead of the actual evidence of the crime for which he or she is on trial.  See <u>McLean v. State</u>, 934 So. 2d 1248, 1255 (Fla. 2006) (quoting <u>Heuring</u>, 513 So. 2d at 124).

The reverse <u>Williams</u> rule is simply the application of <u>Williams</u> rule principles to the circumstance in which a defendant (rather than the State) seeks to introduce evidence of similar crimes committed by another person (rather than the defendant) to show that the defendant did not commit the offense for which he or she is being tried.  See <u>McDuffie</u>, 970 So. 2d at 323 n.2.  Although the risk of wrongful conviction is not present in this context, the supreme court has nonetheless held that reverse <u>Williams</u> rule evidence offered by a defendant must meet the same strict standard of relevance, and thus the same strict standard of similarity, as ordinary <u>Williams</u> rule evidence offered by the State.[5]  <u>Savino</u>, 567 So. 2d at 893, 894; <u>see also</u>

---

[5]This is not the universal approach to an attempt by a criminal defendant to offer other crimes evidence to shift suspicion to another person.  See <u>Rivet v. State</u>, 43 Fla. L. Weekly D1651, D1652 (Fla. 1st DCA July 25, 2018) (explaining that in

Huggins v. State, 889 So. 2d 743, 762 (Fla. 2004) (explaining that Savino "rejected the argument that the standard of similarity should be less strict when similar-fact evidence is offered by the defendant"). For a defendant to introduce evidence of similar crimes by another person to shift suspicion from himself or herself to that other person, the "evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense." Savino, 567 So. 2d at 894; see also Allison v. State, 746 So. 2d 518, 519 (Fla. 2d DCA 1999) (holding that the inquiry when the defendant sought to introduce reverse Williams rule evidence in a murder prosecution is "whether the State could have used this same testimony if [the other person] himself were on trial for the murder"). Accordingly, to determine whether the evidence of Mr. Nardelli's attack on D.W. was admissible in Mr. Newby's prosecution, we must ask whether the State could have introduced evidence of the attack on D.W. if it had been Mr. Nardelli instead of Mr. Newby who was on trial for entering the home of E.F. and attacking her.

Like other evidentiary questions, a trial court's decisions about Williams rule evidence are reviewed for abuse of discretion. See Huggins, 889 So. 2d at 761. Our court and others have held, however, "that a trial court has somewhat less discretion in deciding whether to exclude a defendant's reverse Williams rule evidence than in deciding whether to introduce the State's Williams rule evidence." Palazzolo v. State, 754 So. 2d 731, 740 (Fla. 2d DCA 2000); see also Edwards v. State, 857 So. 2d 911, 913 (Fla. 3d DCA 2003) ("As the Florida Supreme Court has recognized, reverse Williams rule evidence has a lower potential for prejudice to the State than standard

contrast to the Florida courts, "many courts relax the standard for admitting this kind of evidence" and collecting federal cases to establish that proposition).

Williams rule evidence has to the defendant, thus, the trial court has somewhat less discretion to exclude reverse Williams rule evidence.").  A standard that reviews the exercise of "somewhat less discretion" than a trial court normally has is, we acknowledge, not capable of precise description.  But the general idea is that the appellate courts require more flexibility on reverse Williams rule issues than the abuse of discretion standard usually permits because the issues require the balancing of two competing legal rules—on one hand, an unusual and strict standard of relevance that requires proof of substantial similarity and, on the other, long-settled law "requiring the introduction into evidence of all probative evidence tending to prove a defendant's innocence."  Palazzolo, 754 So. 2d at 740; see also Rivera, 561 So. 2d at 539 (recognizing the admissibility of reverse Williams rule evidence and stating that "where evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission").  The reduced deference we afford a trial court on reverse Williams rule issues thus aligns with our function and vantage point as an appellate court to determine questions that are not purely discretionary but rather have a legal judgment embedded within them.[6]

We turn, then, to whether the trial court's decision that the attack on D.W. was not sufficiently similar to the attack on E.F. to make it admissible was within its discretion.  Arguing that the answer is yes, the State emphasizes that the requirement of similarity demands "a unique or 'fingerprint' type" of connection between the crime being tried and the other act sought to be proved.  See Savino, 567 So. 2d at 894.  The

_____

[6]In this sense, it is not altogether different from saying, as the courts routinely do, that a trial court's discretion in passing on evidentiary questions is limited by the rules of evidence and the decisions interpreting them.  See Davis v. State, 121 So. 3d 462, 481 (Fla. 2013) (quoting Hayward v. State, 24 So. 3d 17, 29 (Fla. 2009)).

- 13 -

fingerprint metaphor can be misleading, however, if it is read to imply that the crimes must be identical in every jot and tittle. The supreme court "has never required the collateral crime to be absolutely identical to the crime charged." Gore v. State, 599 So. 2d 978, 984 (Fla. 1992); see also Grier v. State, 27 So. 3d 97, 100 (Fla. 4th DCA 2009). Rather, it has held that similar act evidence is admissible "where the common points, when considered in conjunction with each other, establish a pattern of criminal activity which is sufficiently unique to be relevant to the issue of identity." Gore, 599 So. 2d at 984; see also Crump v. State, 622 So. 2d 963, 968 (Fla. 1993) ("This Court has upheld the use of collateral crime evidence when the common features considered in conjunction with each other establish a sufficiently unusual pattern of criminal activity."). In contrast, "[i]n cases where there are significant dissimilarities between the collateral crime and the crime charged, the evidence tends to prove only two things—propensity and bad character—and is therefore inadmissible." Gore, 599 So. 2d at 984. The question, then, is on which side of the equation this case falls.

There are undoubtedly substantial points of similarity between the attacks on D.W. and E.F. that make the evidence of D.W.'s attack relevant to the identity of E.F.'s attacker. Each attack took place around 3:00 a.m. The victim in each attack was a middle-aged woman living alone in a small home in the Dunedin area. In each case, the perpetrator hid his face with what the victim described as a ski mask, and there was evidence that in each case the perpetrator wore gloves. The perpetrator in each case was described as having hazel-colored eyes. He was also described as being thin— E.F. used that term, and D.W. described her attacker in terms carrying that implication. The perpetrator in each attack wore dark clothes. After entering the home, the perpetrator rushed to the victim's bedroom and jumped on the victim while she was in

her bed. The perpetrator in each case tried to move the victim's head so that the victim could not see him. Each case appears to have had a sexual motive. And in each case, the attack ended when the perpetrator's eyes met the victim's, prompting—for whatever reason—the perpetrator to flee the house.

If offered in a prosecution of Mr. Nardelli for the attack on E.F., this evidence would have been admissible to show that the defendant confessed to a similar attack against a similar victim at a similar place using similar means. Considered together, these commonalities make the two offenses unique enough to separate them from other crimes and to tend to prove that Mr. Nardelli committed both such that evidence of the collateral crime (Mr. Nardelli's attack on D.W.) is relevant to the identity of the perpetrator of the attack on E.F. See, e.g., Crump, 622 So. 2d at 968 (finding "numerous similarities" establishing "an unusual modus operandi" where victims were the same race and had similar ages and physical builds and the manner of each crime was similar); Gore, 599 So. 2d at 983-84 (finding in a kidnapping and murder case, "the required pervasive similarities" for introduction of evidence of other crimes where there were significant similarities between two victims and the attacks were committed using similar pretenses and ended in similar ways). Put differently, the similarities between the two offenses exclude the possibility that evidence of the collateral crime would merely suggest bad character or criminal propensity. Indeed, according to the evidence, these were the only crimes of their kind in Pinellas County in the months around the two attacks.

The State argues that four differences between the attacks on E.F. and D.W. made it proper for the trial court to exclude the evidence: (1) the fact that E.F.'s attacker entered through a locked front door while D.W.'s entered through an unlocked

- 15 -

back door; (2) the fact that E.F.'s attack lasted only five minutes while D.W.'s lasted between twenty and thirty; (3) the fact that E.F.'s attacker never spoke to her while D.W.'s did; and (4) the fact that D.W.'s attacker tried to bind her hands with zip ties while E.F.'s did not. As we have discussed, however, the Williams rule does not require that there be no differences between the two offenses. That "would erect an almost impossible standard of admissibility" for similar fact evidence. Chandler v. State, 702 So. 2d 186, 194 (Fla. 1997). Rather, in cases where, as here, there are pervasive similarities in the two crimes, the question is whether any differences are significant enough to prevent a conclusion that there is a unique or fingerprint-type modus operandi that unites a principal crime and collateral crime or, instead, whether the dissimilarities between the two crimes are merely insubstantial. See id. at 193 (quoting Gore, 599 So. 2d 980-84).

Our decision in State v. Smith, 586 So. 2d 1237 (Fla. 2d DCA 1991), illustrates the point. There, the State sought certiorari review of a pretrial order excluding Williams rule evidence in a prosecution for armed burglary and sexual battery. Id. at 1237-38. The State sought to admit evidence of a separate crime committed in the same apartment complex within three weeks of the offense for which the defendant was being tried. Id. at 1238. Both offenses occurred in the early morning hours; both victims were assaulted in second-floor bedrooms; and in both, the perpetrator cut the crotch out of the victim's underwear. Id. In view of the substantial similarities between the two crimes, we held that the trial judge incorrectly excluded the evidence from admission and granted the State's petition. Id. We addressed the defendant's argument that there were differences in the crimes as follows:

> Smith argues that the two crimes also exhibit several dissimilarities. While it is true that the Williams [r]ule standard is not satisfied merely by proof that the principal crimes are more alike than unalike, we believe the dissimilarities "in the present case" stem less from a deviation in *modus operandi* than from mere happenstance. We do not find the presence of "substantial dissimilarities" such as would overcome the strong argument for the use of Williams [r]ule evidence.

Id. (citation omitted) (quoting Thompson v. State, 494 So. 2d 203, 204 (Fla. 1986)).

Our decision in Corbett v. State, 113 So. 3d 965 (Fla. 2d DCA 2013), involved a prosecution for kidnapping, robbery, and sexual battery and is to similar effect. The trial court there admitted Williams rule evidence of another offense that had significant similarities to the one being tried, which included the facts that (1) the defendant knew both victims, (2) both offenses took place on a holiday, (3) both offenses involved the use of a knife, (4) both victims were forced to undress and remain that way, (5) both victims were forced to ride in a car's reclined passenger seat, (6) the defendant drove both victims to ATMs and took money from their accounts, (7) both offenses lasted several hours, and (8) both victims were released. Id. at 970. Affirming the trial court's ruling, we held that these similarities satisfied the Williams rule. Id. at 970. And we rejected the notion that dissimilarities between the two crimes required a different result, explaining that "the uniqueness of the striking similarities outweighs the differences" and that "[t]he evidence in this case was similar and unique enough" to justify its admission. Id.

We reach the same conclusion here about the differences the State identifies. We do not regard the use of the unlocked door and the duration of the attack as differences in modus operandi at all; as in Smith, they are merely differences in the circumstances that presented themselves to the perpetrator of each crime. See also

- 17 -

Chandler, 702 So. 2d at 194 (explaining that differences between offenses do not go to uniqueness where they merely reflect differences in the opportunities with which the perpetrator was presented).  Someone attempting to break into a home would logically prefer an unlocked door to a locked one (one was available at D.W.'s home, one evidently was not at E.F.'s home), and regardless of how long the two attacks lasted, the evidence showed that both attacks ended when the perpetrator locked eyes with the victim (on the facts presented, it took longer for this to occur in D.W.'s case than in E.F.'s case).  Neither fact detracts from the pervasive similarity of modus operandi in the two cases.  The perpetrator's talking to D.W. and using zip ties, however, do arguably present differences in the manner in which the attacks on D.W. and E.F. were committed.  But, as in Smith and Corbett, those differences are not striking enough to warrant exclusion of the evidence in light of the substantial similarities between the attacks.  These similarities—the hazel eyes, the mask, the gloves, the similarities between the victims, and the fact that both offenses ended when the perpetrator's eyes met the victim's, among others—tend to show that the two offenses were committed by the same person and thereby make the admission of evidence related to the attack on D.W. relevant.[7]

Based on our record, evidence of the attack on D.W. would have been admissible under the Williams rule had Mr. Nardelli (instead of Mr. Newby) been on trial

---

[7]Although the State does not argue that this is a material difference between the two offenses, we note that on the facts of this case, the fact that D.W.'s attack occurred nine months after E.F.'s attack does not alter our conclusion.  See Corbett, 113 So. 3d at 970 ("The time in between the crimes did not render the Williams rule evidence irrelevant in light of the other strong factors that render the evidence relevant.").

for the attack on E.F.  For that reason, the trial court abused its discretion by prohibiting Mr. Newby from introducing that evidence under the reverse <u>Williams</u> rule here.[8]

### *The Trial Court's Error Was Not Harmless Beyond A Reasonable Doubt*

The State argues that any error in precluding evidence of D.W.'s attack was harmless because "Mr. Newby was still able to argue that another person committed burglary."  To prevail on this argument, the State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction."  <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1138 (Fla. 1986).  It cannot do that on these facts.

Mr. Newby's explanation for why he was where he was on the morning of January 3, 2014, is, to say the least, unusual.  A reasonable juror might say that the only thing that made it arguable was Mr. Newby's consumption of eight to ten drinks before meeting Lieutenant Byrd.  But we cannot overlook that the State's evidence of Mr. Newby's guilt was not exceptionally compelling.  E.F.'s description of who attacked her bore marked physical differences to Mr. Newby.  The DNA evidence established nothing except that there was a possibility that Mr. Newby was one of two male contributors to the DNA sample taken from the sweatshirt that Deputy Aitken and Bosco

_____

[8]We disagree with the State that this case is similar to <u>Cooper v. State</u>, 45 So. 3d 490, 494 (Fla. 4th DCA 2010), in which the Fourth District affirmed a trial court's exclusion of reverse <u>Williams</u> rule evidence.  That case involved two drug-related murders with a firearm, and the similarities consisted of the facts that both victims were black and involved with drugs and that both bodies had been shot in similar places and left in similar positions.  <u>Id.</u> at 493.  That case involved no hallmarks of the kind present here, and the Fourth District correctly held that any similarities in <u>Cooper</u> were "overly general" and insufficiently unique.  <u>See id.</u> at 494.

found. Yet E.F.'s DNA was not on that sweatshirt, and the DNA of a man other than Mr. Newby was. There is a plausible innocent explanation for Mr. Newby's partial palm print on E.F.'s bedroom door. Bosco did not lead Deputy Aitken to Mr. Newby, and Mr. Newby through cross-examination sought to raise questions about the reliability of Bosco's efforts to follow the scent the dog picked up outside E.F.'s house.

Mr. Newby's defense was exclusively about identity. Of course, he was able to argue that the perpetrator had to be someone else. But had the trial court admitted the reverse <u>Williams</u> rule evidence, that defense would have been bolstered by allowing the jury to consider whether that someone was Mr. Nardelli, who confessed to a similar offense—which was the only other crime of its type at the time in that area— against a similar victim in the same general area. The evidence would have enabled Mr. Newby to put a face and a similar crime to the theory. Given that the State's case on identity was close, we cannot conclude that there is no reasonable possibility that the exclusion of Mr. Newby's reverse <u>Williams</u> rule evidence did not contribute to the verdict. <u>See, e.g.</u>, <u>Baskin v. State</u>, 255 So. 3d 895, 899 (Fla. 2d DCA 2018) (holding that the erroneous admission of evidence bearing on identity was not harmless where the State's other evidence of identity was slight); <u>In re K.C.</u>, 582 So. 2d 741, 742 (Fla. 4th DCA 1991) (reaching the same conclusion with respect to the erroneous exclusion of reverse <u>Williams</u> rule evidence bearing on identity).

### *Conclusion*

For the foregoing reasons, we reverse Mr. Newby's judgment and sentence and remand this case for a new trial or for such other proceedings as are consistent with this opinion.

Reversed and remanded.

KHOUZAM and BLACK, JJ., Concur.